**FOR PUBLICATION**



FILED

Jul 09 2014, 9:50 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL R. FISHER**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| GEORGE MOSS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1311-CR-961 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Sheila A. Carlisle, Judge
Cause No. 49G03-1304-FA-25428

**July 9, 2014**

**OPINION – FOR PUBLICATION**

**VAIDIK, Chief Judge**

**Case Summary**

In April 2013 George Moss and accomplice Todd Ruffin forced their way into Philip Potenza and Randall Peterman's home. The men robbed the roommates at gunpoint and shot Peterman in the leg. Moss was convicted of burglary, two counts of robbery, criminal confinement, and carrying a handgun without a license. The trial court sentenced Moss to an aggregate term of forty years. Moss now appeals arguing that the trial court erred when it refused to reopen the case to admit a transcript of a statement Moss intended to use to prove his duress defense. He also seeks review of his forty-year sentence. We find that the trial court did not err in refusing to reopen the case and that his sentence is not inappropriate. We therefore affirm the trial court.

**Facts and Procedural History**

The facts most favorable to the judgment follow. On April 16, 2013, Potenza was playing video games with his roommate Peterman in their Indianapolis home. Tr. p. 55, 100. After Potenza received a phone call around 7:00 p.m. from Moss, whom he had known for about five years, Potenza left to go meet Moss down the street in order to buy an ounce of marijuana from him. *Id*. at 57, 59. Upon arriving at the meeting location, a gray Dodge Charger was already waiting for Potenza. *Id*. at 59. Potenza noted that the windows in the Charger had a very dark tint, and he could see only Moss seated in the driver's seat. *Id*. Potenza exited his car, walked to the passenger side of the Charger, and sat inside. *Id*.

Immediately after Potenza closed the door, a man wrapped his forearm around Potenza's neck and placed a gun to the back of his neck. *Id*. at 59-60. This man was later

2

identified as Ruffin. *Id*. at 83-84. Moss then raised his hands and instructed Potenza, "You'd better do everything that this guy says." *Id*. at 60, 95. Moss had seen the gun at a gas station just minutes before the meet-up, and he knew that Ruffin's gun was loaded. *Id*. at 153-54. Ruffin then told Potenza to empty his pockets, so he handed over his wallet, which included about $120 in cash; his passport; social-security card; and identification card. *Id*. at 60-61. Potenza also gave Ruffin his cell phone and car keys. *Id*. at 61, 72. Ruffin then asked Potenza, "How do you get in your house?" *Id*. at 60. Potenza explained that he did not have his house keys on him, which caused Ruffin to become more aggressive. *Id*. Potenza then stated that he had his garage-door opener in his car, and Ruffin told Moss to retrieve the garage-door opener from Potenza's car. *Id*. at 60, 62.

Moss then drove to Potenza and Peterman's home; Ruffin held the gun to the back of Potenza's neck the entire time the three men were in the Charger, until the car pulled into the driveway. *Id*. at 60-61. Upon their arrival, Moss and Ruffin immediately got out of the car. *Id*. at 62. Potenza, who remained in the passenger seat with his hands up, asked, "Do you want me to get out or whatever?" *Id*. at 62, 65. Ruffin replied yes and opened the door for Potenza to exit. *Id*. at 62. Ruffin, however, did not know how to use the garage-door opener, so he placed it in front of Potenza and told him to operate it. *Id*. at 63. Potenza hit the button, and the garage door opened. *Id*. Ruffin immediately turned the gun back on Potenza, and the three men entered the home through the garage. *Id*. at 66, 102. Held at gunpoint by Ruffin, Potenza entered the living room first, followed by Moss. *Id*. at 66. Ruffin continuously pressed the gun against the back of Potenza's head as he forced him into his own home. *Id*.

3

As soon as the men entered the living room, Ruffin demanded, "[G]ive me all your money. Where's the money at?" *Id*. at 66-67. Moss said nothing and remained standing behind Potenza and Ruffin. *Id*. Peterman, who was sitting in a chair across the living room, asked, "Who the hell are you, and what are you doing in my house?" *Id*. at 67. Potenza had known Moss for five years, and Peterman knew him through Potenza; however, neither Potenza nor Peterman had ever met Ruffin before. *Id*. at 59, 65, 103. As Peterman made his statement and attempted to stand up, Ruffin shot him in the leg. *Id*. at 68, 103. Peterman grabbed his leg in an attempt to stop the bleeding, but he did not immediately make any other movements in fear he would be shot again. *Id*. at 104. In shock, Potenza ran into the middle of the living room with his hands up and announced he had money in his room and would get it; Ruffin followed Potenza into his room. *Id*. at 69-70. Potenza was alarmed by the sound of the gun and "had never seen anybody get shot before, so it was pretty shocking." *Id*. at 69. Moss "kind of . . . cringed a little bit from seeing somebody get shot," but he did not really react. *Id*. at 70.

In his room, Potenza gave Ruffin $30, but Ruffin was not pleased with this amount of money and declared, "This is it?" *Id*. at 71. Potenza replied, "This is all I have. You can search everything. You can take whatever you want. I just don't want anybody else to get hurt." *Id*. at 72. As Ruffin and Potenza made their way back to the living room, Potenza heard Peterman say to Moss, "Here's my keys," and that he had money in both a pair of pants and a cooler in his closet. *Id*. at 72-73, 105. Peterman gave Moss the keys. *Id*. at 73, 105. Moss then walked to Peterman's bedroom, opened the closet, took out the pants and the cooler, and tossed the pants to Ruffin in the living room; Ruffin went through

4

the pants. *Id.* at 74-75, 105-06. Ruffin then shouted for Moss to "hurry up." *Id.* at 106. Immediately after going through the cooler, Moss ran out of the garage door they had entered through. *Id.* at 76.

Ruffin lowered his gun and said he knew Potenza and Peterman were going to call the cops, but they assured him that they would just go to the hospital. *Id.* at 77. Ruffin then said, "Well, we're going to do it like this," and looked as if he was going to bring the gun up again. *Id.* Peterman was "pretty sure [he] was about to die." *Id.* at 107. However, Ruffin suddenly turned and ran out of the garage, leaving the door open. *Id.* at 78. A few seconds later, Ruffin ran back in the room, pointed his gun at Peterman, and demanded he hand over his phone. *Id.* at 79. Moss yelled, "Let's go. We got 'em," and Ruffin ran back out the garage door, this time closing it behind him. *Id.* at 79, 107. Neither Potenza nor Peterman ever saw Ruffin point his gun at Moss. *Id.* at 97, 124. Ruffin also said nothing threatening to Moss during the robbery. *Id.* at 174,183. After making sure Moss and Ruffin were gone for good, Potenza helped Peterman to his car and drove him to St. Francis Hospital. *Id.* at 81, 110.

The same day of the incident, Indianapolis Metropolitan Police Department Officer Michael Ollanketo interviewed Potenza. *Id.* at 38. Potenza told Officer Ollanketo that he had been robbed at gunpoint at his home; he gave a basic description of Moss and Ruffin and indicated that he had spoken on the phone with Moss before the incident. *Id.* at 39. Also that same day, Detective Jon Green took a statement from Peterman after he was transported to Methodist Hospital. *Id.* at 39, 49. Detective Green said Peterman was coherent but clearly medicated and in a lot of pain, and Detective Green could tell "he

5

really wasn't focused on having a conversation." *Id*. at 46, 49. Peterman explained to Detective Green that he had been sitting at home when Potenza returned with Moss and Ruffin, who was pointing a gun at the back of Potenza's head. *Id*. at 50. And, when Peterman asked Ruffin who he was, Ruffin shot him in the leg. *Id*. Peterman also told Detective Green that Moss had his hands in the air and looked as if he was being held up too. *Id*. at 112. A transcript was later made of this statement. Peterman's time at the hospital "was pretty much a blur," and he "[did not] remember much" about it because he was "in shock." *Id*. at 111, 121.

The next day, Peterman's sister discovered that his .45 Taurus handgun had also been stolen. *Id*. at 116. That same day, Potenza, who was friends with Moss on Facebook, went through Moss's friends and was able to find and identify Ruffin by pictures; he emailed the pictures to the police. *Id*. at 83-84. Potenza and Peterman each later identified both Moss and Ruffin in separate photo arrays. *Id*. at 83-86, 134-35.

Ten days after the incident, Officer Erik Forestal took Moss into custody. *Id*. at 30. That same day, Officer Forestal recovered the handgun taken from Potenza and Peterman's home at Moss's residence, after Moss disclosed the location of the gun in an interview with Detective Chester Gooch. *Id.* at 30, 35-36, 138. During the first part of Moss's interview with Detective Gooch, he denied knowing Ruffin or seeing his face, but he later admitted Ruffin was the other man present during the robbery. *Id*. at 177.

The State eventually charged Moss with Count I: Class A felony burglary; Count II: Class A felony robbery; Count III: Class B felony robbery; Count V: Class B felony

6

criminal confinement; and Count VII: Class C felony carrying a handgun without a license.[1]  Appellant's App. p. 88-97.  A bench trial was held.

At trial, Moss presented a duress defense.  Moss testified that Ruffin pointed a gun at him and told him that Ruffin would kill him if he did not do everything he was told to do.[2]  Tr. p. 153-54.  According to Moss, Ruffin forced him to call Potenza and then made him get in the driver's seat of the Charger and drive it to the meeting location.  *Id*. at 154-55.  Moss testified that although he tried to tell Ruffin that Potenza and Peterman did not have much in their home to steal, Ruffin kept telling him, "Just do everything I tell you to do, and I won't kill you."  *Id*. at 156-57.

When defense counsel requested that the transcript of Peterman's statement given to Detective Green at the hospital be marked as defense exhibit A, the State objected to the admission of the transcript as an exhibit but not to the transcript being marked; defense counsel did not respond to this objection.  *Id*. at 52.  Large portions of the statement were read into the record during Peterman's direct and cross-examinations.  *Id*. at 111-13, 122-24.  When asked about the statement,  which included Peterman saying that he saw Ruffin point his gun at Moss and that Moss "had his hands up like he was pretty much being held up, too," Peterman explained that his prior recollection was not accurate.  *Id*. at 112.  That is, Peterman clarified that Ruffin "never" pointed his gun at Moss and Ruffin and Moss

---

[1] The State charged Moss and Ruffin in the same information.  Moss was charged with Counts I, II, III, V, and VII.  Ruffin was charged with counts I, II, III, IV, V, and VI.

[2] Per Indiana Code § 35-41-3-8, which states the defense of duress does not apply to a person that "committed the offense against the person as defined in Ind. Code 35-42", the defense of duress does not apply to Moss's criminal confinement and robbery convictions, because they fall within section 35-42.

"pretty much just acted like a team." *Id*. at 113; *see also id*. at 123-24 (Peterman reiterated he never saw Ruffin point the gun at Moss). Additionally, Peterman testified that it looked like the two men knew what they were doing, and Ruffin never threatened or ordered Moss around. *Id*. at 113, 124 ("I'm a hundred percent [sure] he never pointed the gun at Moss.") Moss also testified that Ruffin made no life-threatening statements to Moss while they were in front of Potenza and Peterman. *Id*. at 174, 183.

Peterman's statements to Detective Green were also discussed during the cross-examination of Detective Green and Moss's closing argument. *Id*. at 51-52, 195-196. The defense rested without seeking to formally introduce the statement into the record, but after closing arguments, defense counsel said he would like the court to have an opportunity to look at the statement. *Id*. at 184, 205. After clarifying that the statement was not yet in evidence, the trial court stated "all the evidence has been completed. I can't allow anyone to reopen the evidence, especially after you've made your arguments and the Court has indicated to you what things it's pondering and just interested in as far as the law." *Id*. at 205-06. The trial court returned a judgment of guilty on all counts. Appellant's App. p. 19-20.

The sentencing hearing was held in October 2013, and due to double-jeopardy concerns, the trial court reduced Moss's conviction for Count I: Class A felony burglary to a Class B felony and Count V: Class B felony criminal confinement to a Class D felony. *Id*. at 22. The court found Moss's two young children, his remorse, the results of the robbery, and the courtroom full of his friends and family as mitigating circumstances. Tr. p. 249-50. In aggravation, the court considered Moss's extensive criminal history. *Id*. at

8

255.  The court specifically found Moss's juvenile crimes of battery, attempted auto theft, and conversion, as well as his adult crimes of carrying a handgun without a license as both a misdemeanor and a felony, possession of cocaine, dealing and possession of marijuana, resisting law enforcement, driving while suspended, and theft convictions as aggravating circumstances.  *Id.* at 254-55.  Before sentencing Moss, the trial court stated:

> So what does this criminal history tell us about you?  . . .  [Y]ou're repeating criminal behavior after you've been given opportunities to reform your behavior through – beginning with sentences that didn't even involve jail time, to sentences that were probationary, to short periods of executed sentences with long periods of suspended time. . . .   In all of this criminal history, I only found one probation that actually ended successfully. . . .  So it just appears from your prior criminal history that you're not going to stop criminal behavior and that you're not learning anything from the opportunities the courts have given you.

*Id.* at 251-52.  The court found that Moss's extensive criminal history outweighed any mitigating circumstances. *Id.* at 255.  Moss was sentenced to ten years on Count I, thirty years on Count II, ten years on Count III, 545 days on Count V, and four years on Count VII.  Appellant's App. p 23.  Count III was to be served consecutive to Count II, and all other counts were to be served concurrently, for an aggregate sentence of forty years in the Department of Correction.  *Id.*

Moss now appeals.

**Discussion and Decision**

Moss raises two issues on appeal.  First, Moss contends the trial court abused its discretion by not reopening the case to admit the statement taken during Peterman's interview with Detective Green at the hospital.  Second, Moss argues his sentence is inappropriate in light of the nature of his offenses and his character.

9

## I. Motion to Reopen the Case

Moss contends the trial court abused its discretion when it denied his request to reopen the case and admit the transcript of the statement taken during Peterman's interview with Detective Green at the hospital. The granting of permission to reopen a case is generally within the discretion of the trial court, and the decision will be reviewed only to determine whether there has been an abuse of discretion. *Ford v. State*, 523 N.E.2d 742, 745 (Ind. 1988). A party should be afforded the opportunity to reopen its case to submit the evidence which could have been part of its case-in-chief. *Id.* Factors the trial court uses to weigh its discretion include whether there is any prejudice to the opposing party, whether the party seeking to reopen appears to have rested inadvertently or purposely, the stage of the proceedings at which the request is made, and whether any real confusion or inconvenience would result from granting the request. *Id.* at 745-46. Two conditions must be met in order for an appellate court to set aside the ruling of a trial court made in the exercise of its discretion: 1) the action complained of must have been unreasonable in light of all attendant circumstances or it must have been clearly unattainable and 2) the action was prejudicial to the rights of the complaining party. *Id.* at 746.

As a preliminary matter, the State argues that Moss waived this issue because defense counsel did not make a formal motion to reopen the case. Nevertheless, because we prefer to decide cases on the merits, we will assume that defense counsel moved to reopen the case to admit the transcript of Peterman's statement. Even if the court had reopened the case and admitted Peterman's statement, it would have been for impeachment purposes only, not as substantive evidence to prove Moss's defense of duress. This is

10

because the statement is hearsay. Moss argues that defense counsel laid a proper foundation for the admission of Peterman's prior inconsistent statement under Indiana Evidence Rule 801(d)(1). Appellant's Br. p. 9. He is incorrect. Indiana Evidence Rule 801(d) states that a statement is not hearsay if:

> (1) The declarant testifies and is subject to cross-examination about a prior statement, and the statement: (A) is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition.

Although Peterman testified and was subject to cross-examination, the statement was not given under oath. It was therefore inadmissible hearsay. At best, Peterman's prior inconsistent statement was admissible only to impeach him, not as substantive evidence to prove that Moss was also under the threat of Ruffin's gun. *See Young v. State*, 746 N.E.2d 920, 926 (Ind. 2001) ("Ordinarily, prior inconsistent statements are used to impeach, not as substantive evidence of the matter reported.") But the statement was already discussed during Peterman's direct and cross-examination in an attempt to impeach him. Specifically, Peterman was asked questions about the statement and significant parts of it were read into the record. Peterman admitted his prior statement was not accurate. Because the statement was used during Moss's case-in-chief for the only purpose it could have been used—impeachment—it was not error for the trial court to refuse to reopen the case after the defense rested. During his case-in-chief, Moss's impeachment of Peterman was complete, and admitting the transcript of Peterman's statement to Detective Green would have been cumulative.

## II. Inappropriate Sentence

11

Moss also contends that his aggregate forty-year sentence is inappropriate in light of the nature of his offenses and his character. He argues that given his passive role in these offenses, his sentences should be served concurrently, which would result in a sentence of thirty years. The Indiana Constitution authorizes independent appellate review and revision of a trial court's sentencing decisions. *Brown v. State*, 10 N.E.3d 1, --- (Ind. 2014). "We implement this authority through Indiana Appellate Rule 7(B), which provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision we find the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Id.* (quotations omitted.) "We have long said that sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008) (citing *Morgan v. State*, 675 N.E.2d 1067, 1072 (Ind. 1996)). In determining whether a sentence is appropriate the court looks at the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case. *Id.* at 1224. Moss bears the burden on appeal of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

Moss received the advisory sentence for each of his offenses. *See* Ind. Code § 35-50-2-4 to 7. Count II: Class A felony robbery and Count III: Class B felony robbery were to be served consecutively, totaling forty years. His other sentences were to be served concurrently, for an aggregate sentence of forty years. This is within statutory range.

As to the nature of the offenses, but for Moss's instigation and participation, this incident could not have occurred. Only Moss knew Potenza and Peterman beforehand.

12

And only Moss knew Potenza's address and telephone number, which he used to set up the meeting. Additionally, Moss retrieved Potenza's garage-door opener out of Potenza's car and drove Ruffin's car to Potenza and Peterman's home. Also, serious bodily injury occurred to Peterman when Ruffin shot him in the leg. Although Moss did not pull the trigger or shoot Peterman, Moss "is still guilty under the theory of accomplice liability." *Brown*, 10 N.E.3d at ---. Moss argues that "there was no way [he] could have anticipated that . . . Ruffin would shoot Peterman in such a spontaneous, arbitrary fashion." Appellant's Br. p. 20. However, Moss saw Ruffin's loaded gun before he and Ruffin met up with Potenza. *Id*. Without Moss's instigation and participation the crimes could not have occurred; Moss alone brought all of the players together. Moss's involvement and the nature of the crimes support his forty-year sentence.

In evaluating Moss's criminal character, this Court has stated that "[t]he significance of a criminal history in assessing a defendant's character is based on the gravity, nature, and number of prior offenses in relation to the current offense." *Boling v. State*, 982 N.E.2d 1055, 1060 (Ind. Ct. App. 2013) (citing *Rutherford v. State*, 866 N.E.2d 867, 874 (Ind. Ct. App. 2007)). Even a minor criminal history is a poor reflection of a defendant's character. *Id*. Moss, however, does not have a minor criminal history. Moss's juvenile and adult offenses include battery, auto theft, criminal conversion, carrying a handgun without a license, possession of cocaine, dealing in marijuana, possession of marijuana, criminal recklessness, resisting law enforcement, driving while license suspended, and theft. Presentence Investigation Report at 4-8. Moss has violated probation numerous times and failed to comply with mandated community service. *Id*. at 4-8. Moss

has also been arrested sixteen times and has eight prior convictions, including two misdemeanor convictions and six felony convictions. *Id.* at 8. Moss's first adjudication occurred when he was eleven years old. *Id.* Moss began using marijuana at the age of thirteen and reported his last use on April 26, 2013, after the events in this case. *Id*. at 12. He also began illegally using Percocet, Vicodin, and Lortab at the age of twenty-three and began using these drugs regularly at age thirty-one; he reported taking up to two pills a day also until April 26, 2013. *Id.* Moss's criminal history shows that he is a habitual offender, and unfortunately, his criminal behavior has escalated to involve multiple victims and serious violence against those victims. Moss's aggregate forty-year sentence is not inappropriate given the nature of the offenses and his character.

Affirmed.

NAJAM, J., and BROWN, J. concur.