## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 15 2020, 7:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark A. Kiesler
New Albany, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Derek J. Tanksley, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | April 15, 2020 <br><br> Court of Appeals Case No. 19A-CR-2539 <br><br> Appeal from the Washington Superior Court <br><br> The Honorable Frank Newkirk, Jr., Judge <br><br> Trial Court Cause No. 88C01-1901-F6-114 |

**Tavitas, Judge.**

# Case Summary

Derek J. Tanksley appeals his convictions and sentence for possession of methamphetamine, a Level 6 felony, and possession of paraphernalia, a Class C misdemeanor. We affirm.

# Issues

Tanksley raises three issues on appeal, which we restate as follows:

I. Whether the trial court abused its discretion in admitting Tanksley's Facebook communications into evidence.

II. Whether the State presented sufficient evidence that Tanksley constructively possessed methamphetamine and paraphernalia.

III. Whether Tanksley's sentence is inappropriate in light of the nature of the offenses and his character.

# Facts

In January 2019, Glenda Mousty informed Officer James Moore of the Salem Police Department that Steven Brown intended, on January 25, 2019, to transport narcotics from Indianapolis "[to] bring back to [sell in] Salem[.]"[1] Tr. Vol. II p. 182. Mousty reported that Brown: (1) had a suspended driver's

---

[1] The record reveals that, by his own admission, Officer Moore improperly characterized Mousty as a "confidential informant" in his police report, when Mousty was more appropriately described as a "concerned citizen." Tr. Vol. II p. 183.

license; (2) would be driving a white, two-door convertible with a black top; (3) would be transporting methamphetamine in a black bag that Brown kept under a seat; and (4) would likely have a concealed weapon under his seat. Mousty also provided Brown's date of birth.

[4] On January 23, 2019, Officer Moore processed Brown's name and date of birth "through the Washington County Dispatch" and confirmed that a Steven Brown with the same date of birth had a suspended driver's license. *Id*. at 43. Officer Moore also viewed Brown's photograph in the Bureau of Motor Vehicles ("BMV") records.

[5] On January 25, 2019, Officer Moore and Officer Chad Webb,[2] who was on duty with his K-9 partner, had just "got[ten] off a detail [involving] a possible drunk driver." *Id*. at 28. The officers were parked in their respective squad cars and conversing in a parking lot. As the officers spoke, Officer Moore observed a white Chrysler Sebring convertible that matched the description provided by Mousty "on Jackson Street traveling west[.]" *Id*. at 184-85.

[6] Officer Moore entered his squad car, drove a short distance, and repositioned his squad car to get another look at the vehicle. "Using [his] vehicle headlights[,] the lamp, [and] streetlights[,]" Officer Moore recognized Brown as the driver. *Id*. at 187. Officer Moore "ran the vehicle's registration" and waited

---

[2] Officer Webb has since attained the rank of Captain.

for Officer Webb to pull up behind him. The officers then initiated a traffic stop at the intersection of Fair Street and Old State Road 60.[3] *Id.* at 188.

[7] Brown and four passengers, including Tanksley, were in the vehicle. Tanksley was seated in the front passenger seat. Melissa Livingston, Charles Glenn, and Tanksley's ex-wife, Rosetta Simpson, were in the back seat. Officers Moore and Webb approached the vehicle together. On the driver's side of the vehicle, Officer Moore asked for Brown's driver's license and registration. Brown "fidget[ed] and would not make eye contact with [Officer Moore]." *Id.* at 189. Tanksley immediately asked "why [the officers] stopped [ ] Brown" and "[h]ow [the officers] knew that [ ] Brown had a suspended license." *Id.* at 190.

[8] Officer Moore also asked for Tanksley's identification, which Tanksley gave to Officer Webb. Officer Moore checked Brown's and Tanksley's driver's licenses against BMV records from his squad car[4] and determined that Brown and Tanksley had suspended driver's licenses. In the meantime, Officer Webb observed that all of the occupants of the vehicle fidgeted and moved around excessively. Officer Webb relayed his observations to Officer Moore.

[9] Officer Moore approached the vehicle and, concerned by the occupants' excessive movements and Mousty's tip regarding a potential weapon in the vehicle, "pulled everyone out of the vehicle." *Id.* at 191. While all stood in

---

[3] The convertible was not registered to Brown or any of the occupants.

[4] None of the remaining passengers carried personal identification.

front of his squad car, Officer Moore asked for the back seat passengers'
respective dates of birth. Contemporaneously, based on his observations of the
car occupants' conduct, Officer Webb decided to conduct an open air sniff with
his canine partner.[5] The canine officer alerted at the trunk of the vehicle.

[10] Brown and Tanksley became agitated, "got very irate[,]" "rowdy[,]" and
"rais[ed] their voice[s]." *Id*. at 192. On learning that the canine officer alerted
on the vehicle, Tanksley stated that "the dogs are trained to hit on every
vehicle." *Id*. at 212. Officers Webb and Moore handcuffed Brown and
Tanksley and requested backup. Officer Moore placed Brown in his squad car,
while Officer Webb stood nearby with Tanksley and the other passengers.

[11] Officer Moore initiated a search of the vehicle based on the canine officer's
alert. The search yielded: (1) a blue and black bag under the driver's seat that
contained two glass pipes with white residue, a wooden pipe, and a small
digital scale; (2) a pack of cigarettes by the speedometer with a clear baggie
containing 0.03 grams of methamphetamine tucked into the outer cellophane
sleeve; (3) a syringe tucked under the back seat; and (4) two syringes tucked
between the back seat and the back seat head rest."[6] *Id*. at 195.

---

[5] Officer Webb's canine partner, Zuma, is trained to detect methamphetamine, heroin, cocaine, and marijuana odors.

[6] Investigators did not recover any narcotics from the trunk of the vehicle. Officer Webb later testified that this may have resulted from changed wind direction, potential drug odors on the contents of the trunk, or if—perhaps—the person who closed the trunk had drug residue on his or her hands.

[12] Subsequently, a search at the jail yielded a distinctive digital scale, bearing the name of rap musician Snoop Dogg, on Tanksley's person. Also, pursuant to a search warrant, Captain Webb obtained access to Tanksley's Facebook account, including Tanksley's Facebook communications with the various occupants of the vehicle in the twenty-four to thirty-six-hour period before Tanksley's arrest.

[13] On January 28, 2019, the State charged Tanksley with possession of methamphetamine, a Level 6 felony; the State also alleged that Tanksley was an habitual offender. On March 20, 2019, and March 22, 2019, respectively, the State charged Tanksley with possession of a syringe, a Level 6 felony, and possession of paraphernalia, a Class C misdemeanor.[7] On March 29, 2019, Tanksley filed a motion in limine to exclude Indiana Evidence Rule 404(B) evidence relating to Tanksley's Facebook communications;[8] the trial court denied the motion in limine.

[14] Tanksley was tried by a jury on August 14, 2019. Officers Moore and Webb testified to the foregoing facts. In its case-in-chief, the State moved to introduce

---

[7] The charging information alleging possession of paraphernalia provides that Tanksley "did knowingly or intentionally possess an instrument, device, or object, to-wit: digital scales, glass pipes, and wooden pipe[.]" App. Vol. II p. 54.

[8] Tanksley also filed a motion in limine concerning the digital scale that was recovered from his person and the field testing performed thereon. The trial court denied Tanksley's motion in limine regarding the fact that the digital scale was seized, but granted the motion in limine as follows: (1) the digital scale recovered from Tanksley's person was "not to be described as paraphernalia"; and (2) the result of the field testing was inadmissible. *See* Conf. App. Vol. III p. 44.

Tanksley's Facebook communications. Tanksley objected that the Facebook communications were irrelevant and prejudicial and argued as follows:

> . . . [T]he Facebook messages are not relevant to whether or not my client was, in fact, in possession of methamphetamine, syringes, or other paraphernalia on January 25, 2019. To put my client into the drug trader boat is, majorative [sic[9]], is not probative, it is prejudicial. I believe that these messages are not at all related to the [methamphetamine] that was found on January 25, 2019. Relevance is very broad . . . , but these conversations have nothing to do with whether or not he actually possessed these things in this place at this time. It is an attempt to paint my client with a drug seller brush without any proof that he was selling drugs.

*Id*. at 220. The State responded:

> These are messages from the 24th and the 25th of January. [ ] [I]f you talk about methamphetamine all night, and you talk about going to Indianapolis. You set up a ride with the person who was driving the car. You have Facebook messages about buying methamphetamine and selling methamphetamine with one of the people [] in the back seat. It's the very definition of relevance. Is it prejudicial? Absolutely its [sic] prejudicial. But again, it goes to the weight, not the evidence. It's not so prejudicial that it should be kept out, it's certainly not inflammatory. These are the defendant's statements made contemporaneously within the twenty-four to thirty-six hours of this traffic stop.

---

[9] We believe the court reporter intended to use the word "pejorative[.]"

*Id*. at 221.  The trial court admitted the Facebook communications into evidence.

[15]  Officer Webb then testified in the following colloquy, that—based upon his training and experience—Tanksley's Facebook communications in the twenty-four to thirty-six-hour period preceding the arrest, which included references to "grams, ounces, [and] amounts of money[,]" pertained to the negotiation, bidding, possession, and/or sale of methamphetamine, *id*. at 240:

> [Officer Webb]: Well, on the first page, a guy makes a comment to Mr. Tanksley about ["]damn look at you, you're a regular ice cream Escobar.["]  Ice cream is a slang term for methamphetamines.  Escobar was a drug cartel.  I mean, it's saying he's trying to become a drug dealer.
>
> * * * * *
>
> [Officer Webb]: [ ] On this page, [Tanksley] says I've got seven hundred for two.  Which in my training and experience, it's seven hundred dollars for two ounces.
>
> * * * * *
>
> [Officer Webb]: And then [Tanksley]'s flashing money on the next page.
>
> * * * * *
>
> [Officer Webb]: They talk about selling drugs, they're negotiating prices, on where to meet and where to go pick them up.  [ ]

*Id*. at 218-19. At the close of the evidence, the jury found Tanksley guilty of possession of methamphetamine and possession of paraphernalia, and not guilty of possession of a syringe. Tanksley subsequently admitted to being an habitual offender.

[16] The trial court conducted Tanksley's sentencing hearing on September 27, 2019, and found, as aggravating factors: (1) Tanksley's criminal history; (2) his prior failures to comply with probation and/or pretrial release; and (3) his lack of remorse. The trial court found, as a mitigating factor, that no serious harm to persons or property resulted from Tanksley's crimes. The trial court imposed the following concurrent sentences: two years executed in the Department of Correction ("DOC") for possession of methamphetamine; and sixty days executed for possession of paraphernalia. The trial court enhanced Tanksley's sentence by four years for the habitual offender adjudication, resulting in an aggregate sentence of six years.[10] Tanksley now appeals.

# Analysis

## I.    *Admission of Evidence*

[17] Tanksley argues that the trial court abused its discretion when it admitted the "inadmissible and prejudicial" Facebook messages, which, Tanksley contends, constituted improper Evidence Rule 404(B) evidence of other acts and "merely

---

[10] Tanksley received 160 days of jail time credit.

show[ed] Tanksley's propensity . . . to be involved with illegal narcotics." Tanksley's Br. pp. 7, 8. This issue is waived.

[18] At trial, Tanksley did not object to the admission of the Facebook communications on Evidence Rule 404(B) grounds; rather, he challenged the Facebook communications as irrelevant and overly prejudicial, pursuant to Evidence Rule 403. *See Halliburton v. State*, 1 N.E.3d 670, 683 (Ind. 2013) (deeming waived Halliburton's claim that the trial court abused its discretion by admitting improper Evidence Rule 404(B) evidence of a prior burglary when, "at trial[,] Halliburton objected to testimony concerning the prior burglary on [Evidence Rule 403] grounds"); *see Turner v. State*, 953 N.E.2d 1039, 1045 (Ind. 2011) (holding "a defendant may not argue one ground for objection at trial and then raise new grounds on appeal"). Tanksley has waived this claim of error for appellate review.[11]

[19] Waiver notwithstanding, Tanksley also argues that admission of the Rule 404(B) evidence was error because Tanksley did not allege any contrary intent at trial. A trial court's ruling on the admission of evidence is generally accorded a great deal of deference on appeal. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015), *reh'g denied*. We do not reweigh the evidence; rather, we consider only evidence that is either favorable to the ruling or unrefuted and favorable to the defendant. *Beasley v. State*, 46 N.E.3d 1232, 1235 (Ind. 2016). We will not

___

[11] Tanksley does not allege fundamental error or present a cogent fundamental error argument in his brief.

reverse an error in the admission of evidence if the error was harmless. *Messel v. State*, 80 N.E.3d 230 (Ind. Ct. App. 2017).

[20] Evidence Rule 404(B) provides:

> (b) Crimes, Wrongs, or Other Acts.
>
> > (1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> >
> > (2) *Permitted Uses*; *Notice in a Criminal Case.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. [ ]

[21] Tanksley cites *Wickizer v. State*, 626 N.E.2d 795, 799 (Ind. 1993), for the proposition that Indiana law does not "authorize the general use of prior conduct evidence as proof of the general or specific intent element in criminal offenses" unless "a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent."

[22] *Wickizer* is inapposite here. Tanksley disregards the fact that Rule 404(B) expressly permits the admission of evidence of defendant's crimes, wrongs, or other acts for other purposes, including to prove a defendant's preparation or plan. *See* Evid. R. 404(B)(2). Such is the case here, where Tanksley's Facebook communications illustrated the travel, bidding, and negotiation components of

his efforts to acquire the methamphetamine. The trial court did not abuse its discretion in admitting the Facebook communications.

## II. *Sufficiency of Evidence*

[23]     Next, Tanksley argues that the State failed to prove that Tanksley had the requisite intent to possess the methamphetamine and paraphernalia that were found in the vehicle. When there is a challenge to the sufficiency of the evidence, "[w]e neither reweigh evidence nor judge witness credibility." *Gibson v. State,* 51 N.E.3d 204, 210 (Ind. 2016) (citing *Bieghler v. State,* 481 N.E.2d 78, 84 (Ind. 1985), *cert. denied*). Instead, "we 'consider only that evidence most favorable to the judgment together with all reasonable inferences drawn therefrom.'" *Id.* "We will affirm the judgment if it is supported by 'substantial evidence of probative value even if there is some conflict in that evidence.'" *Id.; see also McCallister v. State,* 91 N.E.3d 554, 558 (Ind. 2018) (holding that, even though there was conflicting evidence, it was "beside the point" because that argument "misapprehend[s] our limited role as a reviewing court"). Further, "[w]e will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Love v. State,* 73 N.E.3d 693, 696 (Ind. 2017) (citing *Drane v. State,* 867 N.E.2d 144, 146 (Ind. 2007)).

[24]     Tanksley contends that the State presented insufficient evidence to prove that he intended to maintain dominion and control over the methamphetamine and

paraphernalia that were found in the vehicle.[12] To prove a defendant possessed contraband, the State is required to prove either actual or constructive possession. *Eckrich v. State*, 73 N.E.3d 744, 746 (Ind. Ct. App. 2017).

> Actual possession occurs when a person has direct physical control over an item. Constructive possession occurs when a person has (1) the capability to maintain dominion and control over the item; and (2) the intent to maintain dominion and control over it. When a person has exclusive possession of the premises in which contraband is found, he is assumed to know about the presence of the contraband and be capable of controlling it. However, when possession of the premises is not exclusive, the State must show additional circumstances that indicate the defendant's knowledge of the presence of the contraband and ability to control it.

*Bailey v. State*, 131 N.E.3d 665, 683 (Ind. Ct. App. 2019) (citations and quotation marks omitted), *trans. denied*. "Such additional circumstances include incriminating statements by the defendant, attempted flight, a drug manufacturing setting, *proximity of the defendant to the drugs, drugs being found in plain view,* and the location of the drugs in proximity to items owned by the defendant." *Id*. (emphasis added).

[25] This is a case of constructive possession. The State presented the following evidence at trial to prove Tanksley's knowledge of the methamphetamine and paraphernalia and Tanksley's control of the contraband. Officer Moore's

---

[12] Tanksley does not challenge the State's proof of any other element of the offenses.

search of the vehicle yielded methamphetamine on the dashboard near the speedometer and a bag containing paraphernalia under the driver's seat. At the time of the traffic stop, Tanksley was seated in the front passenger seat of the vehicle with immediate access to the contraband. The State, thus, presented into evidence "additional circumstances that indicated [Tanksley]'s knowledge of the presence of the contraband and ability to control it," namely, that the methamphetamine was in plain view and that the bag containing the paraphernalia was in close physical proximity to Tanksley. *Id*. Moreover, (1) the discovery of a second digital scale on Tanksley's person; (2) Tanksley's incriminating Facebook communications in the twenty-four to thirty-six-hour period preceding his arrest; and (3) Captain Webb's testimony that Tanksley's Facebook communications pertained to the sale and possession of methamphetamine further support the inference that Tanksley had the intent and capability to maintain dominion and control over the methamphetamine and paraphernalia that were found in the vehicle.

[26] Based on the foregoing, a jury could reasonably infer Tanksley's capability and intent to maintain possession and control of the methamphetamine and paraphernalia that were found in the vehicle. *See Bailey v. State*, 131 N.E.3d at 684 (finding sufficient evidence that defendant constructively possessed controlled substances found in areas in which defendant did not have exclusive access); *see Gray v. State*, 957 N.E.2d 171, 176 (Ind. 2011) (finding sufficient evidence that defendant constructively possessed marijuana found under a

coffee table in a common room).  Sufficient evidence exists to support Tanksley's convictions.

### III.    *Inappropriateness of Sentence*

Lastly, Tanksley argues that his six-year executed sentence is inappropriate in light of the nature of the offenses and his character.  Indiana Appellate Rule 7(B) provides that this Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence "is inappropriate in light of the nature of the offense and the character of the offender."  The defendant bears the burden to persuade this court that his or her sentence is inappropriate.  *Wilson v. State,* 966 N.E.2d 1259, 1266 (Ind. Ct. App. 2012) (citing *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind. 2006)), *trans. denied*.

In Indiana, trial courts can tailor an appropriate sentence to the circumstances presented; the trial court's judgment receives "considerable deference."  *Sanders v. State*, 71 N.E.3d 839, 844 (Ind. 2017) (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008)).  In conducting our review, we do not look to see whether the defendant's sentence is appropriate or "if another sentence might be more appropriate; rather, the question is whether the sentence imposed is inappropriate."  *Sanders*, 71 N.E.3d at 844 (citing *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008)).

When determining whether a sentence is inappropriate, the advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed.  *Childress*, 848 N.E.2d at 1081.  Tanksley was convicted of

possession of methamphetamine, a Level 6 felony. The sentencing range for a Level 6 felony is six months to two and one-half years, with an advisory sentence of one year. *See* Ind. Code § 35-50-2-7. Tanksley was also convicted of possession of paraphernalia, a Class C misdemeanor. The sentencing range for a Class C misdemeanor is a fixed term of not more than sixty days. *See* I.C. § 35-50-3-2.

[30] Additionally, Tanksley was found to be an habitual offender. "The court shall sentence a person found to be a[n] habitual offender to an additional term that is between: . . . two (2) years and six (6) years, for a person convicted of a Level 5 or Level 6 felony." I.C. § 35-50-2-8. Tanksley, thus, faced a potential sentence of eight and one-half years for his Level 6 felony conviction, after the habitual offender enhancement attached, and a potential sentence of sixty days for his Class C misdemeanor conviction. Here, however, the trial court imposed a two-year sentence for Tanksley's Level 6 felony conviction, enhanced by a four-year habitual offender enhancement, for an aggregate sentence of six years. The trial court also imposed a concurrent sixty-day sentence for the Class C misdemeanor.

[31] Regarding the nature of the offenses, Tanksley's Facebook communications establish that he acquired a quantity of methamphetamine that he intended to sell. At the time of his arrest, Tanksley constructively possessed the methamphetamine and paraphernalia, including a digital scale, typically used to measure narcotics in grams and ounces for sale, and a wooden pipe and two glass pipes bearing white residue, typically used to ingest or "test[ ] the strength,

effectiveness or purity" of narcotics. App. Vol. II p. 78. Tanskley was also found in actual possession of a second digital scale.

[32] Regarding Tanksley's character, the following facts—as found by the trial court—provide considerable insight into his character: (1) Tanksley's prior criminal history; (2) prior failures to comply with probation and with terms of pretrial release; and (3) lack of remorse. Tanskley has had numerous contacts with the criminal justice system. As a juvenile, he was adjudicated as a delinquent multiple times for offenses that, if committed by an adult, would constitute visiting a common nuisance, a Class B misdemeanor (2001); illegal possession of alcohol, a Class B misdemeanor (2002); burglary, a Class B felony (2002); and three counts of theft, Class D felonies (2003). *See* Conf. App. Vol. III p. 147 (stating that, as a juvenile, Tanksley "was placed on informal adjustment, formal probation, [ ] in detention, [ ] in residential placement [] and sentenced to Southwest Regional Youth Village"). Each time, Tanksley either failed to successfully complete a court-ordered teen alcohol and drug education program, "his probation was either revoked[,] or his probation was closed as unsuccessful." *Id*.

[33] As an adult, Tanksley amassed four felony convictions and three misdemeanor convictions before the instant offenses. Tanksley's adult felony convictions include convictions for possession of a controlled substance (2012), receiving stolen property (2012), and dealing in a synthetic drug with intent to deliver (2014), as Class D felonies; and possession of a synthetic drug with a prior

conviction, a Level 6 felony (2016). His prior misdemeanor convictions are for public intoxication, a Class B misdemeanor (2010); possession of paraphernalia (2014), possession of a synthetic drug (2016), resisting law enforcement (2016), and invasion of privacy in violation of an order for protection (2018), as Class A misdemeanors. After Tanksley was convicted of the instant offenses, he was convicted of failure to appear, a Level 6 felony, and, once again, Tanksley admitted to being an habitual offender.

[34] The significance of criminal history in assessing a defendant's character is based upon the gravity, nature, and number of prior offenses in relation to the current offense. *Boling v. State,* 982 N.E.2d 1055, 1060 (Ind. Ct. App. 2013). Even a minor criminal history is a poor reflection of a defendant's character. *Moss v. State,* 13 N.E.3d 440, 448 (Ind. Ct. App. 2014).

[35] Despite numerous contacts with the justice system starting in 2005, Tanksley remains undeterred from criminal activity. The pre-sentence investigation report ("PSI") reveals that Tanksley's criminal history is replete with probation violations, including commission of new offenses while on probation and positive drug screens; violation of terms of home detention[13] and/or day reporting; failure to complete court-ordered drug and alcohol programming; and multiple failures to appear for court proceedings.

---

[13] Tanksley successfully completed home detention but failed to pay the associated fees.

[36] The instant convictions stem from drug offenses, and Tanksley has a long history of unchecked substance abuse. According to the PSI, Tanksley reported that he has used marijuana consistently since he was twelve; has been drinking alcohol since age thirteen; and has "use[d] methamphetamine for one to two weeks out of [each] month" since he was twenty. Conf. App. Vol. III p. 151. Tanksley also reported recreational use of cocaine, spice, Percocet, and mushrooms. Although Tanksley readily admits to having a substance abuse problem, he has failed to pursue treatment or to take full advantage of court-ordered drug programming.[14] We cannot say that Tanksley's sentence is inappropriate in light of the nature of his offenses and his character.

## Conclusion

[37] Tanksley's challenge to the admission of the Facebook communications on Evidence Rule 404(B) grounds was waived. Waiver notwithstanding, the trial court did not otherwise abuse its discretion in admitting the Facebook communications. Sufficient evidence exists to support Tanksley's convictions. Tanksley's sentence is not inappropriate in light of the nature of the offenses or his character. We affirm.

---

[14] According to the PSI, Tanksley reported that he has held two jobs in his adult life, one of which he held for ninety days until he "just stopped going to work." Conf. App. Vol. III p. 149. Approximately eight and one-half years before that job, Tanksley held his only other job for nearly six months, until he was fired for smoking marijuana. Tanksley reported that, in the intervening years, he has relied on his parents and grandparents to support him financially; has worked odd jobs in order to generate money to buy drugs; and has dealt drugs.

[38] Affirmed.

Riley, J., and Mathias, J., concur.