# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 20 2020, 8:32 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Joshua Vincent
Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Myriam Serrano
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Devon Seats,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 20, 2020

Court of Appeals Case No.
20A-CR-856

Appeal from the Marion Superior Court

The Honorable Barbara Crawford, Judge

Trial Court Cause No.
49G01-1808-MR-28762

**Darden, Senior Judge.**

# Statement of the Case

Devon Seats appeals the sentence he received for his convictions of murder, a felony[1] and three counts of Level 4 felony burglary.[2] We affirm.

# Issue

Seats presents one issue for our review: whether his sentence is inappropriate.

# Facts and Procedural History

The facts before us are derived from the factual basis established at the guilty plea hearing and the testimony of Sergeant Mark Prater at Seats' sentencing hearing.

On November 20, 2017, Seats, Nehemiah Merriweather, Tarius Blade and Ka'Ron Bickham-Hurst embarked upon a series of home burglaries in Indianapolis, Indiana, commencing with the home of Eric Cummings. The four young men gained entry by breaking a window in the rear of the home. They then ransacked the home and took a laptop and several pairs of Air Jordan shoes.

---

[1] Ind. Code § 35-42-1-1 (2017).

[2] Ind. Code § 35-43-2-1 (2014).

[5] The four young men next arrived at the home of Dr. Kevin Rodgers.[3] Blade knocked on the door, and, believing that no one was inside, all four men went to the back of the home. They used a paving stone from the yard to break a rear window to gain entry into the home, and Seats entered the home. After gaining entry and hearing a voice inside, Merriweather, Bickham-Hurst, and Blade fled from the home. However, Seats remained inside the home and confronted Dr. Rodgers, the homeowner. After shooting Dr. Rodgers multiple times, Seats took several Cathedral High School championship rings and fled from the home.

[6] Officers with the Indianapolis Metropolitan Police Department (IMPD) responded to a call of a person shot, and first responders found Dr. Rodgers in the kitchen of his home with two gunshot wounds, one to the abdomen and another to the head. Medics pronounced Dr. Rodgers dead at the scene. Crime scene specialists located three shell casings inside the home, and later testing revealed that the cartridge casings were all fired by the same firearm.

[7] Apparently not satisfied, Seats, Merriweather, Bickham-Hurst, and Blade decided to burglarize a third home that day. The young men forced entry through a rear bedroom window into a home belonging to Logan Araujo. They

---

[3] Although in the transcript Dr. Rodgers' surname is spelled "Rogers," family, friends, and colleagues of the victim use the spelling of "Rodgers" in the numerous victim impact letters submitted in this case. Thus, we presume "Rodgers" is the correct spelling of the victim's surname and use it here.

took numerous items from the home, including a distinctive gold colored Glock semi-automatic handgun, a shotgun, several watches, and a diamond ring.

[8] Later that afternoon, police stopped a vehicle that had come from Seats' home, and in the trunk of the vehicle they found a 9 millimeter semi-automatic handgun that a firearms examiner later determined was the gun that had fired the shell casings found in Dr. Rodgers' home. In another vehicle, police recovered several Cathedral High School athletic championship rings that were stolen from Dr. Rodgers' home, and subsequent analysis revealed that a DNA sample collected from Seats matched DNA found on the rings. Additionally, police found Eric Cummings' stolen laptop in a vehicle occupied by Blade, Seats, and Merriweather. During the investigation, police also seized the cell phones of all four men. Forensic analysis of their cell phones yielded photos and videos taken on November 20th. In the videos, Merriweather, Blade, Bickham-Hurst, and Seats are holding the gun used to kill Dr. Rodgers and the firearm stolen from Logan Araujo's residence.

[9] Sergeant Mark Prater with the IMPD was the lead detective assigned to this case, and he testified at Seats' sentencing hearing. Sergeant Prater testified that, during his interview of Tarius Blade, Blade stated that when he asked Seats why he had shot Dr. Rodgers, Seats responded, "Because he saw my face." Tr. Vol. II, p. 49.

[10] The State initially charged Seats with Count I murder, a felony; Count II murder, a felony; Count III burglary, a Level 1 felony; Count IV burglary, a

Level 4 felony; Count V burglary, a Level 4 felony; and Count VI burglary, a Level 4 felony. A jury trial was set to begin on these charges on January 13, 2020; however, on the morning of trial, the parties submitted a plea agreement to the trial court. Pursuant to the terms of the plea agreement, Seats agreed to plead guilty to Count I murder and to Counts IV, V, and VI, three counts of Level 4 felony burglary, in exchange for the State's dismissal of the remaining counts. The plea agreement also provided that the sentences on all counts were to run concurrently and that the total aggregate sentence would be capped at fifty years. Seats acknowledged to the trial court that he was pleading guilty for the reason that he was guilty; that he was satisfied with the representation provided by his attorney; and that he wanted to enter into the agreement and was doing so voluntarily. The trial court accepted the plea agreement after finding that a factual basis existed for the pleas; took the matter under further advisement; and set the matter for a sentencing hearing date.

[11] Seats' sentencing hearing was scheduled for February 13th. On the day of sentencing, Seats' counsel informed the court that Seats did not want to proceed with the plea agreement. The trial court requested the parties to submit briefs on the issue of whether the court could "hold [Seats] to his plea agreement." *Id.* at 29. After receiving the parties' briefs/submissions, the court held a hearing on February 27th, at which it noted its authority to move forward with the plea agreement and denied Seats' request to withdraw his pleas. In announcing its decision, the court commented upon Seats' allegation in his brief/submission and argument to the court that he had difficulty understanding the proceedings,

as noted: "Mr. Seats is not new to the criminal justice system. He is currently serving a sentence for another offense. So, he has been through this process before. He is not new to it. So, he does understand what the plea agreement is and what it means." *Id.* at 36-37. In addition, the court stated, "The State also submitted to the Court a jail recording in which Mr. Seats expresses buyer's remorse, not for any other reason other than he just no longer wanted it and he thought he could beat it." *Id.* at 37.

[12] On March 12th, the trial court held Seats' sentencing hearing. Sergeant Prater testified on behalf of the State. Dr. Rodgers' sister, oldest son, and wife gave victim impact statements to the court about how his murder had affected the family. Seats' mother testified on his behalf. The court sentenced Seats to fifty years for his murder conviction and to eight years on each of the three burglary convictions, with all the sentences to be served concurrently, for an aggregate sentence of fifty years pursuant to the plea agreement. The court ordered that the sentence in the instant case be served consecutively to Seats' sentence under a different cause number. Seats now appeals his sentence.

## Discussion and Decision

[13] The sole issue Seats presents in this appeal is whether his sentence is inappropriate in light of the nature of the offenses and his character. Particularly, he suggests that his sentence should be revised to forty-five years.

[14] Although a trial court may have acted within its lawful discretion in imposing a sentence, article 7, sections 4 and 6 of the Indiana Constitution authorize

independent appellate review and revision of sentences through Indiana Appellate Rule 7(B), which provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we determine that the sentence is inappropriate in light of the nature of the offense and the character of the offender. *Thompson v. State*, 5 N.E.3d 383, 391 (Ind. Ct. App. 2014). However, "we must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Stewart v. State*, 866 N.E.2d 858, 866 (Ind. Ct. App. 2007). Such deference to the trial court's judgment should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character). *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). Thus, the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). The defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[15] A plea agreement that does not provide for an open plea but nevertheless affords the trial court some discretion in sentencing is subject to review under Rule 7(B). *Rivera v. State*, 851 N.E.2d 299, 301-02 (Ind. 2006). Such is the case

herein, where the plea agreement capped Seats' aggregate sentence at fifty years but left other aspects of his sentence to the trial court's discretion.

[16] To assess whether a sentence is inappropriate, we look first to the statutory range established for the class of the offenses. Here, Seats was convicted of murder, for which the advisory sentence is fifty-five years, with a minimum sentence of forty-five years and a maximum sentence of sixty-five years. Ind. Code § 35-50-2-3 (2015). In addition, Seats was convicted of three Level 4 felonies, for which the advisory sentence is six years, with a minimum sentence of two years and a maximum sentence of twelve years. Ind. Code § 35-50-2-5.5 (2014). The court sentenced Seats to fifty years for his murder conviction with concurrent sentences of eight years for each of the three Level 4 felonies, for an aggregate sentence of fifty years. Remarkably, Seats' sentence for his murder conviction is less than the advisory sentence for such an offense. Indeed, his aggregate sentence is less than the advisory sentence for murder. Additionally, although his sentences of eight years on his Level 4 felony convictions are just slightly above the advisory sentence, they are significantly below the twelve-year maximum for such felonies.

[17] Next, we look to the nature of the offenses. "The nature of the offense is found in the details and circumstances surrounding the offense and the defendant's participation therein." *Morris v. State*, 114 N.E.3d 531, 539 (Ind. Ct. App. 2018), *trans. denied* (2019). Seats and three of his acquaintances burglarized three homes. At the second home, the young men encountered the homeowner, and Seats' three acquaintances fled. Seats, however, remained

and confronted the homeowner, shooting him twice and killing him. After taking Dr. Rodgers' life, Seats joined his three accomplices in burglarizing yet another home. Seats has failed to present any evidence that points to the nature of these offenses that shows he exercised restraint or regard for human life or the homes or possessions of others.

[18] Finally, we turn to the character of the offender. The character of the offender is found in what we learn of the defendant's life and conduct. *Id.* The significance of a criminal history in assessing a defendant's character and an appropriate sentence varies based on the gravity, nature, and proximity of prior offenses in relation to the current offense, as well as the number of prior offenses. *Sandleben v. State*, 29 N.E.3d 126, 137 (Ind. Ct. App. 2015), *trans. denied*. Yet, even a minor criminal history is a poor reflection of a defendant's character. *Moss v. State*, 13 N.E.3d 440, 448 (Ind. Ct. App. 2014), *trans. denied*.

[19] Seats' criminal history is comprised of a December 2016 true finding of dangerous possession of a firearm, a Class A misdemeanor if committed by an adult. Seats committed the offense when he was just fifteen years old, and his juvenile records with regard to that offense reflect unsuccessful probation, unsuccessful suspended commitment to the Department of Correction, failure to complete substance abuse evaluation and treatment, and a failed probation sanction. In August 2017, at the age of sixteen, Seats added true findings of seven counts of unauthorized entry of a motor vehicle, all Class B misdemeanors if committed by an adult, and eight counts of theft, all Class A

misdemeanors if committed by an adult. He was placed under the supervision of the juvenile court for nine months with specific conditions for compliance.

[20] Just two months later in October 2017, while still under the supervision of the juvenile court, Seats committed the offense of attempted armed robbery, a Level 3 felony. The charge was originally filed in juvenile court but was later re-filed in adult court. While in custody, Seats' inmate records reflect two incidents of jail rule violations, an incident of assault, and an incident of disruption of jail operations. Just one month later, while still under the supervision of the juvenile court, Seats committed the instant offenses.

[21] Seats' actions upon committing this murder further inform us of his violent character. Rather than flee with his accomplices, he remained inside Dr. Rodgers' home and shot the doctor twice. Then, while Dr. Rodgers lay dying on his kitchen floor, Seats burglarized the doctor's home before fleeing and joining the others in burglarizing a third home. Upon completing this crime spree, Seats memorialized the occasion by making videos of himself holding the murder weapon and celebrating.

[22] In addition, the trial court found Seats failed to show or express any remorse for his conduct. At sentencing, Seats stated to the court, "You know it felt like everything was against me first of all. I would just to like [sic] I ain't had a fair shake because just everything was against me. I feel like I got railroaded basically." Tr. Vol. II, p. 68. In response, the court stated, "Mr. Seats, I am a little bit disturbed by some of your thought process when you were doing your

allocution. I'm concerned about how you have processed this whole thing. What I saw on that video was not somebody that considered themselves a victim. But that's what I heard from you today. So, I do not find that there is any remorse that you've shown for what's happened." *Id.* at 75.

[23] To summarize, the use/misuse of a firearm is a prevalent theme in Seats' criminal history; his offenses are violent and serious and quickly escalated in severity; and, even while the juvenile court was expending effort toward his rehabilitation, he was committing new crimes. Moreover, his callous character and cavalier attitude toward the taking of a human life is evidenced by the cell phone photos and videos. We find no compelling evidence of substantial virtuous traits or persistent examples of good character to support a reduction of Seats' sentence.

[24] Seats asserts that, at the time of these crimes, he was a juvenile whose character and judgment were not fully developed such that he is less culpable than an adult offender. Therefore, he argues, his sentence is inappropriate and should be reduced.

[25] We are mindful that, as our Supreme Court has explained, "[s]entencing considerations for youthful offenders—particularly for juveniles—are not coextensive with those for adults." *Brown v. State*, 10 N.E.3d 1, 6 (Ind. 2014). There, the Court determined that a sentence of 150 years for a sixteen-year-old "'forswears altogether the rehabilitative ideal.'" *Id.* at 8 (quoting *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 2465, 183 L. Ed. 2d 407 (2012)). The

Court found the sentence to be a "'denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the [juvenile] convict, he will remain in prison for the rest of his days.'" *Brown*, 10 N.E.3d at 8 (quoting *Graham v. Florida*, 560 U.S. 48, 70, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010)). Accordingly, the Court reduced Brown's 150-year sentence to eighty years. *See Brown*, 10 N.E.3d at 8.

[26] In contrast, the fifty-year sentence here does not equate to such a denial of hope. Rather, Seats will, in all likelihood, outlive his sentence such that behavior modification and character improvement while incarcerated will be useful. Indeed, in sentencing Seats, the court specifically recommended that he be afforded the opportunity to participate in any behavioral modification programs available in the Department of Correction. *See* Tr. Vol. II, p. 76. Moreover, the trial court considered Seats' age in determining his sentence and found his age to be the sole mitigating circumstance. The trial court also noted the possible presence of developmental delays but determined they did not overcome Seats' ability to be able to tell right from wrong. *See id.* at 75. Additionally, Seats' sentence can hardly be said to be an extreme punishment, even for a juvenile, when his aggregate sentence for murder and three Level 4 felonies is less than the advisory sentence for the sole offense of murder.

# Conclusion

[27] Seats has not met his burden of presenting compelling evidence portraying in a positive light the nature of his offenses or his character in order to overcome the trial court's sentencing decision.

[28] Affirmed.

Crone, J., and Weissmann, J., concur.