

FILED

Sep 27 2023, 9:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Christopher Kunz
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Steven J. Hosler
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

Ricky L. Wilson,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

September 27, 2023

Court of Appeals Case No.
22A-CR-2837

Appeal from the Marion Superior
Court

The Honorable Angela Dow
Davis, Judge

Trial Court Cause No.
49D27-2105-F4-16332

**Opinion by Judge Tavitas**
Judges Bailey and Kenworthy concur.

**Tavitas, Judge.**

## Case Summary

[1] Ricky Wilson was convicted of criminal recklessness, a Level 5 felony; escape, a Level 6 felony; and possession of cocaine, a Level 6 felony. The trial court sentenced Wilson to four years executed and one year suspended to probation. Wilson appeals and claims that the State failed to present sufficient evidence to support his convictions and that his sentence is inappropriate. We disagree and, accordingly, affirm.

## Issues

[2] Wilson presents three issues, which we restate as:

I. Whether the State presented evidence that Wilson was subject to a home detention order and knowingly violated the terms of that order sufficient to support a conviction for escape.

II. Whether the State presented evidence that Wilson constructively possessed cocaine found in Wilson's home sufficient to support his conviction for possession of cocaine.

III. Whether Wilson's sentence of four years executed and one year suspended to probation is inappropriate in light of the nature of Wilson's offenses and Wilson's character.

## Facts

[3] On the evening of May 23, 2021, Neurin Barraza had a cookout in the backyard of her home in Indianapolis. After the cookout, at around 10:00 p.m., Barraza

went back outside and saw a man, later identified as her next-door neighbor, Wilson, lying on the ground. Barraza asked Wilson who he was, but Wilson was unresponsive. When Wilson stood up, she called for her sister to bring a gun. Several members of Barraza's family came outside, armed with guns. Wilson stated, "Don't shoot," and identified himself to Barraza as her "neighbor, Ricky." Tr. Vol. II p. 46. Wilson held a firearm in one hand and his phone in the other.

[4] Wilson claimed that he had followed someone from Wilson's yard, through Barraza's yard, and into the yard of Barraza's neighbor on the other side. Barraza and her family spent several minutes attempting to find this person but were unsuccessful. Barraza noticed that Wilson appeared to be under the influence of an illicit substance and was "twe[a]king."[1] *Id*. at 48. Barraza's daughter observed that Wilson was wearing an ankle monitor. Barraza and her family then went back inside Barraza's house, and Barraza went to sleep. Wilson, however, continued to search for the man he claimed had been in their yards.

[5] At around 2:30 a.m., Barraza received a telephone call from Wilson, who informed her that people were outside both of their homes. Barraza looked outside and saw no one, so she went back to bed. Wilson called her again and said that there were twenty-five people surrounding their homes. Barraza again

---

[1] "Tweak" means "[t]o behave in an agitated or compulsive manner, especially when under the influence of a stimulant drug." American Heritage Dictionary, Tweak (5th ed. 2022).

looked outside and saw no one. She told Wilson that no one was outside and went back to bed. Later, Barraza heard what she thought was someone setting off fireworks outside.

[6] Meanwhile, starting shortly before midnight, Wilson had been repeatedly calling 911. Ultimately, he called 911 a total of fourteen times. At first, no officers were dispatched due to the frequency of the calls. At 3:00 a.m. that morning, Wilson called 911 and stated that twenty-five people were outside his home attempting to set it on fire and that he had fired a shot at one of the people. The record does not reflect how many times the police went to Wilson's home that night in response to his many calls.

[7] Then, at around 10:00 a.m., Indianapolis Metropolitan Police Department ("IMPD") Officer Ryan Duell responded to yet another 911 call from Wilson, this time for a burglary in progress. When Officer Duell arrived at Wilson's home, Wilson told him that someone was inside the garage. Officer Duell checked the garage but found no one there. Noting that Wilson had made repeated calls to 911 and made apparently unfounded claims, Officer Duell requested someone from IMPD's mobile crisis team, known as "MCAT," come and talk with Wilson. Tr. Vol. II p. 27. MCAT officers "respond to in-crisis runs where someone may be in some type of psychiatric duress and attempt to engage these people and get them involved in services." *Id*. MCAT Detective Robert Robinson came to Wilson's home to speak with him. Detective Robinson noted that Wilson's speech was "rapid and pressured," which indicated to him that Wilson was experiencing a type of mania caused by

mental illness or drug use.  *Id*. at 30.  Detective Robinson offered to refer Wilson to mental health services, but Wilson declined.

[8]     While the police were still speaking with Wilson, Barraza was awakened by her sister yelling that someone had fired a bullet into the house.  Barraza's sister found a 9mm bullet lodged in a box in the laundry room.  Upon further investigation, Barraza and her sister found a bullet hole in the wall of the bathroom next to the laundry room and a bullet hole in the bathroom door.  Barraza went outside and saw a bullet hole in the exterior wall of her house on the side that faced Wilson's house.  Barraza approached Detective Robinson and informed him of the bullet hole in her wall.  When Detective Robinson inspected the hole in Barraza's wall, he noticed a hole in one of the windows of Wilson's home on the side facing Barraza's house.

[9]     Detective Robinson called for additional officers.  When they arrived, Wilson permitted the police to search his house.  One of the officers, Detective Romeo Joson, saw that Wilson was wearing an ankle monitor.  Inside, the police saw a bullet hole in the window facing Barraza's home.  There was also a bullet lodged in the wall.  The police also observed smoking pipes with steel wool filters connected to the pipes.  Under the couch cushions, the police found a clear plastic bag containing a white crystalline substance that was later determined to contain cocaine.  No one else was found in the home.  The police did not locate a firearm, but when the police patted Wilson down, they found a spent 9mm shell casing in his pocket.  The police learned that Wilson was serving a sentence on home detention.

On May 27, 2021, the State charged Wilson with: Count I, possession of a firearm by a serious violent felon, a Level 4 felony; Count II, criminal recklessness, a Level 5 felony; Count III, escape, a Level 6 felony; Count IV, possession of cocaine, a Level 6 felony; Count V, unlawful possession of a firearm by a domestic batterer, a Class A misdemeanor; and Count VI, possession of paraphernalia, a Class C misdemeanor.

A jury trial was held on August 2, 2022. The jury found Wilson guilty of escape and possession of cocaine but acquitted him of possession of paraphernalia. The jury was unable to reach a verdict on the remaining counts. On October 18, 2022, Wilson entered into a plea agreement with the State in which he agreed to plead guilty to criminal recklessness; in exchange, the State dismissed the counts of unlawful possession of a firearm by a serious violent felon and unlawful possession of a firearm by a domestic batterer.

On October 31, 2022, the trial court sentenced Wilson on the criminal recklessness conviction to five years, with one year suspended to probation. The trial court also sentenced Wilson to concurrent one-year sentences on the escape and possession of cocaine convictions, both of which were suspended to probation. Wilson now appeals.

## Discussion and Decision

### I. Sufficient Evidence

Wilson claims that the State failed to present sufficient evidence to support his convictions for escape and possession of cocaine. "Claims of insufficient

evidence 'warrant a deferential standard, in which we neither reweigh the evidence nor judge witness credibility.'" *Stubbers v. State*, 190 N.E.3d 424, 429 (Ind. Ct. App. 2022) (quoting *Powell v. State*, 151 N.E.3d 256, 262 (Ind. 2020)), *trans. denied.* On appeal, "[w]e consider only the evidence supporting the judgment and any reasonable inferences drawn from that evidence." *Id.* (citing *Powell*, 151 N.E.3d at 262). "'We will affirm a conviction if there is substantial evidence of probative value that would lead a reasonable trier of fact to conclude that the defendant was guilty beyond a reasonable doubt,'" and we will affirm a conviction "'unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* (citing *Powell*, 151 N.E.3d at 262). Thus, it is not necessary that the evidence overcome every reasonable hypothesis of innocence; instead, the evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.* (citing *Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007); *Sutton v. State*, 167 N.E.3d 800, 801 (Ind. Ct. App. 2021)

## A. Escape

[14]  Wilson first argues that the State failed to present sufficient evidence to support his conviction for escape. To convict Wilson of escape as charged, the State was required to prove that Wilson: "knowingly or intentionally violate[d] a home detention order, to-wit: by possessing a firearm and/or cocaine." Appellant's App. Vol. II pp. 28-29; *see also* Ind. Code § 35-44.1-3-4(b) (2014)

("A person who knowingly or intentionally violates a home detention order . . . commits escape, a Level 6 felony."). [2]

[15] Wilson argues that the State failed to prove that he violated a home detention order because "the State presented no evidence that a valid home detention order was ever issued against Wilson." Appellant's Br. p. 15. We disagree. Detective Joson testified that Wilson was on home detention at the time of the shooting and that Wilson was serving a "home detention sentence." Tr. Vol. II p. 138. Detective Joson also saw that Wilson was wearing an ankle monitor. From this, the jury could reasonably conclude that Wilson was subject to a home detention order. Wilson argues, however, that this was insufficient to show that the home detention order was a valid home detention order.

[16] Wilson cites *Russell v. State*, 189 N.E.3d 1160 (Ind. Ct. App. 2022), in support of his argument that the State must provide proof of a **valid** home detention order before a defendant may be convicted of escape. In *Russell*, the defendant had been convicted of theft, a Class A misdemeanor. The trial court sentenced Russell to one year of incarceration but allowed her to serve the sentence on home detention through community corrections. The State subsequently charged Russell with escape, a Level 6 felony, for failure to charge the battery on her GPS ankle bracelet. Russell moved to dismiss the charges, but the trial court denied her motion.

---

[2] This statute has since been amended. We apply the version in effect at the time of the instant offense.

[17]   On appeal, another panel of this Court noted that the trial court did not sentence Russell to home detention as a condition of probation. *Id*. at 1162. Thus, the only way in which the trial court could have imposed home detention was as a direct commitment to community corrections. *Id*. at 1163. The statutes authorizing direct placement in community corrections, however, apply only to certain non-suspendible felony convictions. *See id*. (citing Ind. Code § 35-38-2.6-1). The panel then concluded:

> Although the propriety of Russell's underlying sentence to home detention is not before us, this background informs our analysis of the issue on appeal: whether the trial court properly refused to dismiss the escape charge. Because the trial court did not enter home detention as a condition of probation—the only means available for a misdemeanant like Russell—it did not issue any "home detention order." Because no "home detention order" exists, the State had no grounds for charging Russell with Level 6 felony escape based on her alleged violation of a "home detention order." Russell therefore is entitled to dismissal of that charge.

*Russell*, 189 N.E.3d at 1163 (footnote omitted). From this, Wilson contends that the State was required to prove that he was subject to a valid home detention order and the mere fact that he was serving a sentence on home detention is insufficient to prove that the order was valid. We find *Russell* to be distinguishable.

[18]   In *Russell*, the defendant moved to dismiss and affirmatively demonstrated that the home detention order she was accused of violating was improperly entered. On denial of her motion to dismiss, we disagreed and determined that under no

set of facts could Russell be guilty of violating a home detention order because there was, in effect, no home detention order. In contrast, here Wilson did not move to dismiss the escape charge on the basis that the home detention order he is accused of violating was invalid or improperly entered. Instead, he effectively admitted that he was on home detention at the time. During cross-examination of Detective Joson, the following exchange occurred between defense counsel and the detective:

> Q:    Okay. Additionally, you testified that Mr. Wilson was on home detention at the time this occurred, right?
>
> A.    Yes, sir.
>
> Q.    And, as [the prosecuting attorney] pointed out, he was serving a sentence, correct.
>
> A.    Yes, sir.

Tr. Vol. II p. 142. Defense counsel then asked questions suggesting that, if Wilson was on home detention and monitored via GPS, then the State should have been able to track where he had been and recovered the gun used to shoot at Barraza's home. Then, during Wilson's closing argument, defense counsel stated:

> But you have to ask yourselves, Mr. Wilson – and it's a critical part of one of the counts that the State has brought against Ricky – and that is that he was on home detention, and he disobeyed an order of home detention. That is either he possessed a firearm, or he used -- or he had cocaine. Okay? **So, we know he's on home detention, right?** The detective also told you what? You could find his whereabouts; they knew where he was. Where did

he hide this gun? Why not look at his home detention data and say hey, did the man really leave the house? That information was available. You don't have it.

*Id*. at 154 (emphasis added).

[19] Here, instead of reviewing the denial of a motion to dismiss where the underlying home detention order was demonstratively shown to have been improperly entered (as in *Russell*), we are reviewing the sufficiency of the evidence following a jury trial where the defense theory was to effectively admit that the defendant was on home detention as a result of a sentence.

[20] The plain language of the escape statute requires the defendant to have knowingly or intentionally violated "a home detention order." *See* I.C. § 35-44.1-3-4(b) (2014). And here, there was evidence that Wilson was on home detention, i.e., subject to a home detention order, at the time of the new offenses. Although it may have been preferable for the State to introduce the home detention order itself into evidence, we are unwilling to say that the failure to do so was fatal to the State's case. Detective Joson's testimony was sufficient to show that Wilson was on home detention, i.e., subject to a home detention order, at the time of the instant offenses. Wilson's argument to the contrary is essentially a request that we reweigh the evidence and conclude that Detective Joson's testimony was insufficient, which we will not do.

[21] There was also sufficient evidence that Wilson violated the terms of his home detention order by committing a new crime. Pursuant to Indiana Code Section 35-38-2.5-6(4), home detention orders must include "[a] requirement that the

offender is not to commit another crime during the period of home detention ordered by the court."[3]  By committing a new crime, Wilson necessarily violated the terms of his home detention.  The jury could reasonably infer that, by possessing a firearm and cocaine, Wilson knowingly violated the terms of his home detention.

[22]  In summary, the State presented evidence that Wilson was on home detention on the day in question and that Wilson committed new crimes by possessing cocaine and shooting at his neighbor's home.  From this, the jury could reasonably conclude that Wilson knowingly or intentionally violated a home detention order, thereby committing the crime of escape.

## B.  Possession of Cocaine

[23]  Wilson also challenges the sufficiency of the evidence supporting his conviction for possession of cocaine.  Wilson claims that there was insufficient evidence that he constructively possessed the cocaine found in his house.  We disagree.

[24]  Possession can be either actual or constructive.  *Woodward v. State*, 187 N.E.3d 311, 319 (Ind. Ct. App. 2022) (citing *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011)), *reh'g denied*.  To prove constructive possession, the State must prove that

---

[3] Indiana Code Section 35-38-2.5-6 states that its provisions apply to "[a]n order for home detention of an offender under section 5 of this chapter," which governs home detention ordered as a condition of probation. Ind. Code § 35-38-2.5-5(a).  Trial courts may also order a person to serve a sentence on home detention as a direct commitment to community corrections.  *See* Ind. Code Ch. 35-38-2.6.  If a trial court orders home detention as a direct commitment, however, such placement "must comply with all applicable provisions in . . . IC 35-38-2.5 [dealing with home detention]."  Ind. Code § 35-38-2.6-4.5.  Thus, home detention orders, whether entered as a condition of probation or as a direct commitment in community corrections, must include a requirement that the offender not commit another crime during the period of home detention.

the defendant had both the intent and the capability to maintain dominion and control over the contraband. *Id*. (citing *Parks v. State*, 113 N.E.3d 269, 273 (Ind. Ct. App. 2018)). Wilson does not contest that he had the capability to maintain dominion and control over the cocaine.[4] Instead, he argues that the State failed to prove that he had the intent to maintain dominion and control over the cocaine.

[25] A jury may infer that a defendant had the intent to maintain dominion and control over contraband from the defendant's possessory interest in the premises, even when that possessory interest is not exclusive. *Id*. (citing *Gee*, 810 N.E.2d at 341). If the defendant's possessory interest is not exclusive, however, the State must support this inference with additional circumstances pointing to the defendant's knowledge of the presence and the nature of the item.[5] *Id*. at 174-75.

[26] Here, we need not consider such additional circumstances because there is no indication that Wilson's possessory interest in the home was not exclusive. On the morning in question, Wilson was the only person in the home. The police

---

[4] Rightly so. "A trier of fact may infer that a defendant had the capability to maintain dominion and control over contraband from the simple fact that the defendant had a possessory interest in the premises on which an officer found the item." *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011) (citing *Gee v. State*, 810 N.E.2d 338, 340 (Ind. 2004)). This inference is allowed even if the possessory interest is not exclusive. *Id*. (citing *Gee*, 810 N.E.2d at 341). Here, Wilson does not deny that the cocaine was found in his home.

[5] Such circumstances include, but are not limited to: "(1) a defendant's incriminating statements; (2) a defendant's attempt to leave or making furtive gestures; (3) the location of contraband like drugs in settings suggesting manufacturing; (4) the item's proximity to the defendant; (5) the location of contraband within the defendant's plain view; and (6) the mingling of contraband with other items the defendant owns." *Gray*, 957 N.E.2d at 175 (citing *Gee*, 810 N.E.2d at 341).

searched the house for other people but found no one. Wilson notes that his home had two bedrooms and argues from this that the State did not prove that his possession of the home was exclusive. The mere fact that a home has two bedrooms, however, does not indicate that more than one person lives in the home. Furthermore, there was no evidence that the other bedroom was occupied.

[27] Accordingly, the State showed that Wilson was in exclusive possession of the home at the time the cocaine was found in his couch. This is sufficient to establish that Wilson had both the capability and intent to maintain dominion and control over the cocaine. *See id*.; *see also Goliday v. State*, 708 N.E.2d 4, 6 (Ind. 1999) (holding that defendant's intent to maintain dominion and control over illicit drugs found in a car could be inferred from his exclusive possession of the car in which the drugs were found even though defendant borrowed the car, because "the issue . . . is not ownership but possession").

## II. Appellate Rule 7(B)

### A. State's Argument

[28] Before we address the merits of Wilson's sentencing argument, we address the State's claim that Wilson waived his right to challenge his sentence in his plea agreement.

[29] The State correctly notes that, in *Creech v. State*, 887 N.E.2d 73, 75 (Ind. 2008), our Supreme Court held that "a defendant may waive the right to appellate

review of his sentence as part of a written plea agreement." In *Creech*, the defendant's plea agreement included the following provision:

> I understand that I have a right to appeal my sentence if there is an open plea. An open plea is an agreement which leaves my sentence to the Judge's discretion. **I hereby waive my right to appeal my sentence so long as the Judge sentences me within the terms of my plea agreement**.

*Id*. at 74 (emphasis added). This, the Court held, was sufficient to waive the defendant's right to appeal his sentence. *Id*. at 76-77.

[30] Similarly, in *Davis v. State*, 207 N.E.3d 1183 (Ind. 2023), *reh'g pending*, the defendant's plea agreement stated, "The Defendant **hereby waives the right to appeal any sentence imposed by the Court**, including the right to seek appellate review of the sentence pursuant to Indiana Appellate Rule 7(B), so long as the Court sentences the defendant within the terms of this plea agreement." *Id*. at 1185 (emphasis added).[6] The Court held that this waiver

---

[6] In other cases in which we held that a plea agreement contained a valid waiver of the right to appeal, the waiver provision was unambiguous and explicit. *See, e.g., Starcher v. State*, 66 N.E.3d 621, 621 (Ind. Ct. App. 2016) (where plea agreement provided, "[a]s a condition of entering this plea agreement, defendant knowingly and voluntarily agrees to waive the right to appeal the sentence on the basis that it is erroneous or for any other reason so long as the Judge sentences him/her within the terms of this agreement"), *trans. denied*; *Westlake v. State*, 987 N.E.2d 170, 174 (Ind. Ct. App. 2013) (where plea agreement stated, "you waive your right to have any Court review the reasonableness of the sentence, including but not limited to appeals under Indiana Rule of Appellate Procedure 7( [B] ), and you agree and stipulate that the sentence of the Court is reasonable and appropriate in light of your nature and character, and the nature and character of the offense"); *Brown v. State*, 970 N.E.2d 791, 791-92 (Ind. Ct. App. 2012) (where plea agreement provided, "[t]he Defendant hereby waives his right to appeal his sentence so long as the Judge sentences him within the terms of the plea agreement. The Defendant further agrees that any sentence within the range provided in the plea agreement is reasonable and appropriate, including the maximum sentence, based upon aggravating circumstances which are hereby stipulated"); *Bowling v. State*, 960 N.E.2d 837, 838 (Ind. Ct. App. 2012) (where the plea agreement provided, "[b]y pleading guilty you have agreed to waive your right to appeal your

was unambiguous and acted to waive the defendant's right to appeal his sentence. *Id*. at 1186.[7]

[31] Contrariwise, in *Johnson v. State*, 145 N.E.3d 785, 786 (Ind. 2020), the defendant's plea agreement broadly stated that "defendant waives right to appeal and post conviction relief."[8] Noting that the waiver of post-conviction rights is unenforceable and that the waiver of the right to appeal was not specific regarding the right to appeal a sentence, our Supreme Court held that this waiver was invalid. *Id*. at 787. *See also Williams v. State*, 164 N.E.3d 724 (per curiam) (citing *Johnson* and holding that provision of plea agreement stating that "defendant waives right to appeal" was not a valid waiver of the defendant's right to appeal his sentence).

[32] Here, Wilson's plea agreement included a provision that stated: "It is further agreed that the sentence recommended and/or imposed is the appropriate sentence to be served pursuant to this agreement." Appellant's App. Vol. II p.

---

sentence so long as the Judge sentences you within the terms of your plea agreement"), *trans. denied*; *Brattain v. State*, 891 N.E.2d 1055, 1057 (Ind. Ct. App. 2008) (where plea agreement provided, "[d]efendant further waives the right (under Indiana Appellate Rule 7 and I.C. 35-38-1-15 or otherwise) to review of the sentence imposed").

[7] The *Davis* Court also held that, if the defendant wished to challenge the validity of his guilty plea, he had to do so in a petition for post-conviction relief, not on direct appeal. *Davis*, 207 N.E.3d at 1188. Justice Goff, in a dissent in which the Chief Justice joined, disagreed and believed that the trial court's later mis-advisement that Davis still had the right to appeal his sentence rendered the waiver of the right to appeal the sentence ineffective. *Id*. at 1190 (Goff, J., dissenting).

[8] The text of the plea agreement in *Johnson* was in all capital letters. We have changed the text to lower-case letters to aid in legibility.

173. This, the State argues, means that Wilson waived his right to appeal his sentence. We disagree.

[33] The language in Wilson's plea agreement does not state that he waived the right to appeal at all. It merely indicates that Wilson agreed that any sentence imposed would be appropriate. Furthermore, Wilson's plea agreement delineated the rights Wilson was giving up by pleading guilty, including (1) the right to speedy and public jury trial; (2) the right to confront witnesses; (3) the right to compulsory process to obtain witnesses in his favor; (4) the right to require the State to prove his guilt beyond a reasonable doubt; (5) the right not to testify against himself; (6) the right to present evidence on his own behalf; (7) the right to be presumed innocent; and (8) "the right to **appeal the conviction(s)**." Appellant's App. Vol. II p. 173 (emphasis added). Notably absent from this list is the waiver of the right to appeal the sentence.

[34] Under these circumstances, we conclude that Wilson did not waive the right to appeal his sentence when he pleaded guilty to criminal recklessness. At most, he severely undercut any argument he has on appeal that his sentence is inappropriate. *Cf. Childress v. State*, 848 N.E.2d 1073, 1078 (Ind. 2006) (holding that a defendant who agrees to a sentencing range or a sentencing cap in a plea agreement does not waive the right to challenge the appropriateness of his or her sentence on appeal). Because Wilson did not explicitly waive his right to appeal his sentence, we opt to address Wilson's sentencing argument on its merits.

### B. *Wilson's Sentence is Not Inappropriate*

Wilson lastly argues that his sentence of four years executed and one year suspended to probation is inappropriate. The Indiana Constitution authorizes independent appellate review and revision of a trial court's sentencing decision. *Jackson v. State*, 145 N.E.3d 783, 784 (Ind. 2020) (citing Ind. Const. art. 7, §§ 4, 6; *McCain v. State*, 88 N.E.3d 1066, 1067 (Ind. 2018)). Our Supreme Court has implemented this authority through Indiana Appellate Rule 7(B), which allows this Court to revise a sentence when it is "inappropriate in light of the nature of the offense and the character of the offender."[9] Our review of a sentence under Appellate Rule 7(B) is not an act of second guessing the trial court's sentence; rather, "[o]ur posture on appeal is [ ] deferential" to the trial court. *Bowman v. State*, 51 N.E.3d 1174, 1181 (Ind. 2016) (citing *Rice v. State*, 6 N.E.3d 940, 946 (Ind. 2014)). We exercise our authority under Appellate Rule 7(B) only in "exceptional cases, and its exercise 'boils down to our collective sense of what is appropriate.'" *Mullins v. State*, 148 N.E.3d 986, 987 (Ind. 2020) (per curiam) (quoting *Faith v. State*, 131 N.E.3d 158, 160 (Ind. 2019)).

"'The principal role of appellate review is to attempt to leaven the outliers.'" *McCain*, 148 N.E.3d at 985 (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008)). The point is "not to achieve a perceived correct sentence." *Id.* (

---

[9] Though we must consider both the nature of the offense and the character of the offender, an appellant need not prove that each prong independently renders a sentence inappropriate. *See, e.g., State v. Stidham*, 157 N.E.3d 1185, 1195 (Ind. 2020); *Connor v. State*, 58 N.E.3d 215, 219 (Ind. Ct. App. 2016); *see also Davis v. State*, 173 N.E.3d 700, 707-09 (Ind. Ct. App. 2021) (Tavitas, J., concurring in result) (disagreeing with majority's assertion that Appellate Rule 7(B) requires a criminal defendant to prove that his sentence is inappropriate under both prongs of Appellate Rule 7(B).

(citing *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014)). "Whether a sentence should be deemed inappropriate 'turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case.'" *Id*. (quoting *Cardwell*, 895 N.E.2d at 1224). Deference to the trial court's sentence "should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). When determining whether a sentence is inappropriate, the advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Fuller v. State*, 9 N.E.3d 653, 657 (Ind. 2014).

[37] Here, Wilson was convicted of criminal recklessness, a Level 5 felony by his guilty plea, and was convicted of escape and possession of cocaine, both Level 6 felonies, by jury trial. The sentencing range for a Level 5 felony is one to six years, with an advisory sentence of three years. Ind. Code § 35-50-2-6(b). The sentencing range for a Level 6 felony is six months to two and one-half years, with an advisory sentence of one year. Ind. Code § 35-50-2-7(b). Wilson faced a maximum possible sentence of seven years. *See* Ind. Code § 35-50-1-2(d) (providing that, except for "crimes of violence," the total consecutive terms of imprisonment cannot exceed seven years if the most serious crime for which the defendant is sentenced is a Level 5 felony). Here, the trial court sentenced Wilson to five years with one year suspended to probation.

[38] Our analysis of the nature of the offense requires us to look at the nature, extent, heinousness, and brutality of the offense. *Brown*, 10 N.E.3d at 5. Here, nothing about the nature of Wilson's crimes warrants a revision of his sentence. While inside a house containing cocaine and drug paraphernalia, and under the apparent influence of drugs, Wilson shot a firearm through his window and into his neighbor's home—a home that he knew several people occupied. Although only one bullet pierced Barraza's home, Wilson fired at least three shots. We see no compelling evidence that portrays Wilson's offenses in a positive light. It is true that no one was injured by Wilson's actions, but this appears to have been sheer luck.

[39] Our analysis of the character of the offender involves a broad consideration of a defendant's qualities, including: the defendant's age, criminal history, background, past rehabilitative efforts, and remorse. *Harris v. State*, 165 N.E.3d 91, 100 (Ind. 2021); *McCain v. State*, 148 N.E.3d 977, 985 (Ind. 2020). The significance of a criminal history in assessing a defendant's character and an appropriate sentence varies based on the gravity, nature, proximity, and number of prior offenses in relation to the current offense. *Sandleben v. State*, 29 N.E.3d 126, 137 (Ind. Ct. App. 2015) (citing *Bryant v. State*, 841 N.E.2d 1154, 1156 (Ind. 2006)), *trans. denied*. "Even a minor criminal history is a poor reflection of a defendant's character." *Prince v. State*, 148 N.E.3d 1171, 1174 (Ind. Ct. App. 2020) (citing *Moss v. State*, 13 N.E.3d 440, 448 (Ind. Ct. App. 2014), *trans. denied*).

[40] Wilson's poor character is evidenced by his extensive criminal history. Wilson's criminal history extends to the 1970s and includes thirteen convictions, eight of which were felonies. His history includes convictions for robbery, criminal confinement, domestic battery, and auto theft. Prior attempts at rehabilitation and showings of leniency have failed—Wilson has violated the terms of his probation or parole eight times in the past. He was also on probation at the time he committed the instant offenses. Even when incarcerated, Wilson committed many conduct violations. We discern no compelling evidence portraying Wilson's character in a positive light.

[41] Wilson has not met his appellate burden of showing that his aggregate sentence of five years, with four years executed and one year suspended to probation, is inappropriate in light of the serious nature of his offenses and his poor character.

## Conclusion

[42] The State presented evidence sufficient to support Wilson's convictions for escape and possession of cocaine. Further, Wilson's aggregate sentence of five years, with four years executed and one year suspended to probation, is not inappropriate. We, therefore, affirm the judgment of the trial court.

[43] Affirmed.


Bailey, J., and Kenworthy, J., concur.