

FILED

Oct 30 2023, 9:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael B. Troemel
Lafayette, Indiana

Brian A. Karle
Ball Eggleston, PC
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Robert M. Yoke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jennifer L. Dean,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 30, 2023

Court of Appeals Case No.
22A-CR-2104

Appeal from the Carroll Circuit
Court

The Honorable Benjamin A.
Diener, Judge

Trial Court Cause No.
08C01-2107-MR-2

**Opinion by Judge Tavitas**
Judges May and Bradford concur.

**Tavitas, Judge.**

## Case Summary

[1]     Jennifer Dean appeals her conviction for felony murder and her accompanying

sentence of sixty years in the Department of Correction ("DOC"). Dean

argues: (1) the trial court committed fundamental error during voir dire by endorsing eighty-percent certainty as a description of the reasonable doubt standard; (2) the State presented insufficient evidence to support Dean's conviction for felony murder; and (3) Dean's sentence is inappropriate. In the context of this case, we cannot say that the trial court's remark on the reasonable doubt standard during voir dire constitutes fundamental error, and we find Dean's remaining arguments without merit. Accordingly, we affirm.[1]

## Issues

Dean raises three issues on appeal, which we restate as:

I. Whether the trial court committed fundamental error during voir dire by endorsing eighty-percent certainty as a description of the reasonable doubt standard.

II. Whether the State presented sufficient evidence to support Dean's conviction for felony murder.

III. Whether Dean's sentence is inappropriate.

## Facts

In June 2021, Tyrone Leftridge, Shianne Brooks-Brown, and Shianne's daughter were living with Dean at Dean's house in Flora, Indiana. Shianne had known Dean since she was three years old and referred to Dean as her

---

[1] We held oral argument on October 10, 2023, at Mishawaka High School. We thank the students and staff for their warm reception and hospitality, and we commend counsel for their advocacy.

"mom." Tr. Vol. IV p. 103. Shianne has a learning disability, "struggle[s]" with remembering things, and has an eleventh-grade education. *Id*. at 200.

[4] Shianne previously lived with Dean, and at one point, Dean "coordinat[ed]" or "assist[ed]" in Shianne's participation in prostitution on a "weekly basis" over a two-year period. Tr. Vol. V p. 12. Dean kept all the money Shianne made from the prostitution. On several occasions, "the plan would change from sex . . . to just taking the money." Tr. Vol. IV p. 233.

[5] This case concerns a conspiracy formed between Tyrone, Shianne, and Dean on the night of June 15, 2021. The evidence regarding which co-conspirator was responsible for which particular act occasionally conflicts.

[6] The conspiracy began when Tyrone, Shianne, Dean, or some combination proposed a plan to use Shianne's profile on the MeetMe dating app to lure an individual with the prospect of exchanging $120 for sex with Shianne. There was conflicting evidence regarding whether the original plan was for Shianne to engage in prostitution or for Tyrone and Shianne to rob the individual. Dean initially suggested a trailer park as a location for the meeting, but the conspirators later decided that the meeting would instead occur in a nearby alley. Dean would receive $20 for watching Shianne's daughter while Tyrone and Shianne met the individual.

[7] Dean also provided Tyrone with a bandana and either Shianne or Tyrone with a small baseball bat, which Dean kept in her home for "protection." Tr. Vol. III p. 143. A photograph of the bat is shown below:



Ex. 23. Willie Smith, Jr., responded to the MeetMe solicitation and met Shianne in the alley sometime between 1:00 a.m. and 3:00 a.m. on July 16, 2021. Tyrone hid behind a nearby detached garage. Shianne did not have sex with Willie, and at some point, Willie exited the vehicle and pulled out a pocketknife. Either Shianne or Tyrone struck Willie on the head with the bat. Willie fell to the ground, where he was struck several more times.

[8] Shianne and Tyrone returned to Dean's house with the bat along with $120 and Willie's cellphone and wallet. Shianne told Dean to contact the police because "a man . . . was hurt"; however, Dean refused. Tr. Vol. IV p. 150. Dean instructed Tyrone to "get rid of the evidence" and "bleach the bat." *Id*. at 146.

[9] Meanwhile, Willie left the alley and entered a nearby house. At approximately 5:10 a.m., the owners discovered Willie lying on their couch and contacted the police. Flora Police Department Chief James Bishop responded to the scene and "noticed there was substantial trauma to [Willie's] face" and that Willie "would only moan" when spoken to. Tr. Vol. III p. 61. Willie later died from his injuries.

[10] Chief Bishop, who was familiar with Dean, went to Dean's house, showed Dean a photograph of the injured Willie, and asked her if she "was familiar [with] or knew" Willie. *Id*. at 64. Dean denied that she did. Law enforcement located Willie's vehicle soon thereafter. Inside, law enforcement located a receipt for an ATM withdrawal of $120 from 1:05 a.m. that morning. Law enforcement also located surveillance camera footage captured at 2:39 a.m. that morning, which depicted Tyrone, dressed in all black, leaving Dean's house with a bag and then returning without the bag. The footage then showed Tyrone leaving the house in different clothing.

[11] Later that morning, law enforcement stopped Tyrone and Shianne as they were packing up a car in front of Dean's house. The officers recognized Tyrone from the surveillance footage and observed $100 in "crisp, fresh" $20 bills in the cubby of the door by Tyrone. *Id*. at 137. Tyrone was interviewed, and law enforcement determined they had probable cause to arrest him. He was brought to the Carroll County Jail.

[12]   While he was in jail, Tyrone spoke on the phone and exchanged text messages with K.C., the mother of his daughter. During these conversations, Tyrone stated the following: "I[']m pretty sure the truth will come out and they will only get me for robby [sic, robbery]," Ex. Vol. VII p. 46, and, "The full story [is] shy and jen [Shianne and Dean] plan[ned] on getting money[,] and [W]ill wasn't the only 1[.] [Dean] pick[ed] the location where there [were] no cam[eras] bc she live[d] there for a long time . . . ," *id*. at 107. Tyrone also texted Willie's family, "I just want the truth to come out[.] [I] was acomoles [sic, accomplice] of robby [sic, robbery]. . . ." *Id*. at 52 (errors in original).

[13]   Over the course of the investigation, law enforcement learned that Shianne had two cellphones and that "there was a gap of information missing" from approximately 8:00 p.m. on June 15, 2021, to 4:00 a.m. on June 16, 2021, on one of her phones. Tr. Vol. V p. 38. Additionally, two days after the robbery, Dean contacted law enforcement and reported that she found a wallet in her living room but that she did not know to whom it belonged.

[14]   In speaking with law enforcement, Dean and Shianne each changed their story several times. Dean initially reported that she was not involved in any criminal activity but admitted that she received $20 from Tyrone and provided the bat and bandana. Dean eventually told law enforcement that "Tyrone was the one who said he was gonna rob [Willie]." Ex. 37 at 1:35. Shianne and Dean were subsequently arrested. On July 14, 2021, the State charged Dean with two counts: Count I, felony murder; and Count II, conspiracy to commit robbery resulting in serious bodily injury, a Level 2 felony.

[15]     While Dean and Shianne were in jail, Dean encouraged Shianne to "change [Shianne's] story so [Dean] could get out." Ex. 35 at 35:49. Dean also wrote letters to Shianne, one of which said, "[Y]ou asked me to watch [your daughter] so yall could go meet someone down the road—finesse someone— that don't mean to hurt anyone . . . ." Ex. Vol. VII p. 220 (errors in original).

[16]     A jury trial was held in April 2022. During voir dire, the trial court instructed the prospective jurors on the reasonable doubt standard as follows:

> [U]nder the law of this state, proof beyond a reasonable doubt is proof that leaves you firmly convinced of the Defendant's guilt.
>
> There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the Defendant is guilty of the crime charged, you may find him or her guilty. If, on the other hand, you think there is a real possibility that the Defendant is not guilty, you should give the Defendant the benefit of the doubt and find the Defendant not guilty.

Tr. Vol. II p. 47.

[17]     Later during voir dire, the following exchange took place:

> [DEFENSE COUNSEL]: [P]roof beyond a reasonable doubt, how powerful is that proof? How powerful does it need to be to reach that level?
>
> PROSPECTIVE JUROR MARTIN: Well, I - in my opinion, I'd say if on the scale from like 1 to 20, it'd have to be 16.

[DEFENSE COUNSEL]: Okay.  How'd you get to that?

**THE COURT: It's perfect, 80 percent.  I mean, he nailed it.**

*Id.* at 95 (emphasis added).  Neither the State nor Dean objected to or commented on the trial court's spontaneous remark, and Prospective Juror Martin was not selected to serve on the jury.  Several times during voir dire, the State described the reasonable doubt standard as requiring proof that leaves one "[f]irmly convinced" of the defendant's guilt, and the prospective jurors pledged to apply that standard.  Tr. Vol. II p. 63.

[18]   After the jury was selected, the trial court gave the following preliminary instruction:

> [T]he evidence must overcome any reasonable doubt concerning the Defendant's guilt, but it does not mean that a Defendant's guilt must be proved beyond all possible doubt.  A reasonable doubt is a fair, actual, and logical doubt based upon reason and common sense.  A reasonable doubt may arise either from the evidence or from a lack of evidence.  Reasonable doubt exists when you are not firmly convinced of the Defendant's guilt after you have weighed and considered all the evidence.
>
> The Defendant must not be convicted on suspicion or speculation.  It is not enough for the State to show that the Defendant is probably guilty.  On the other hand, there are very few things in this world that we know with absolute certainty.  The State does not have to overcome every possible doubt.  The State must prove each element of the crime by evidence that firmly convinces each of you and leaves no reasonable doubt.  The proof must be so convincing that you can rely and act upon it in this matter of the highest importance.  If you find that there is a reasonable doubt that the Defendant is guilty of the crime,

you must give the Defendant the benefit of that doubt and find the Defendant not guilty of the crime under consideration.

Tr. Vol. III p. 47. The trial court used the same language when delivering the final jury instructions. The trial court also instructed the jury that "[t]he Court's instructions are your best source in determining the law." Tr. Vol. V p. 185.

[19] During the jury trial, Tyrone and Shianne both testified. Tyrone testified that the plan was only for Shianne to exchange sex for money. He explained that he described the plan as one for robbery in his jail conversations with K.C. because he "was mad" and "thought that [Dean] was trying to set [him] up . . . ." Tr. Vol. IV p. 71.

[20] Shianne had trouble understanding the questions and recalling certain events. She testified that Dean "helped plan" the events on the night of June 15, 2020, but she gave conflicting responses regarding whether the original plan was for robbery or prostitution. *Id.* at 201.

[21] The jury found Dean guilty of both counts, and the trial court entered judgment of conviction on Count I.[2] The trial court held a sentencing hearing on August 3, 2022. The trial court found Dean's criminal history to be an aggravating factor, found no mitigators, and sentenced Dean to sixty years in the DOC. Dean now appeals.

---

[2] The trial court dismissed Count II due to double jeopardy concerns.

# Discussion

## *I. Fundamental Error—Reasonable Doubt*

[22] Dean first challenges the trial court's spontaneous remark during voir dire, "It's perfect, 80 percent. I mean, he nailed it," in reference to the reasonable doubt standard. Tr. Vol. II p. 95. Dean argues that the trial court's remark is "in the nature of a court instruction" and, recognizing that Dean did not object to the remark at trial, argues that the remark amounts to fundamental error that violated her due process rights. Appellant's Br. p. 25. We find that, although the trial court's remark was clearly improper, it does not constitute fundamental error under the circumstances of this case.

[23] Our Indiana Supreme Court has explained:

> The Due Process Clause of the Fourteenth Amendment protects an accused "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970). Because of the transcending interest a criminal defendant has in his liberty, the risk of an erroneous conviction necessitates that a substantial burden of proof be placed upon the prosecution. *See Speiser v. Randall,* 357 U.S. 513, 525-26, 78 S. Ct. 1332, 1342 (1958). The standard of proof beyond a reasonable doubt serves to impress upon the fact-finder "the need to reach a subjective state of near certitude of the guilt of the accused." *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 2787 (1979). While the federal constitution requires that juries be instructed "on the necessity that the defendant's guilt be proven beyond a reasonable doubt," it does not require the use of "any particular form of words." *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S. Ct. 1239, 1243 [] (1994). However, the jury instructions,

taken as a whole, must correctly express "the concept of
reasonable doubt to the jury." *Id.*

*Winegeart v. State*, 665 N.E.2d 893, 896 (Ind. 1996).  Ultimately, "[t]he proper
constitutional inquiry is not whether the instruction could have been applied in
an unconstitutional manner, but whether there is a reasonable likelihood that
the jury *did* so apply it."  *Id.* at 897 (quoting *Victor*, 511 U.S. at 6) (emphasis in
original; internal quotation marks omitted).

[24]  Turning to Dean's argument, courts discourage attempts to quantify the
reasonable doubt standard.  *See, e.g.*, *United States v. Smith*, 267 F.3d 1154, 1161
(D.C. Cir. 2001) (observing that the phrase 'proof beyond a reasonable doubt' is
"quantitively imprecise" (citing *Winship*, 397 U.S. at 370) (Harlan, J.,
concurring); *Lord v. State*, 806 P.2d 548, 552 (Nev. 1991) ("Parties to a criminal
case should assiduously avoid . . . attempts to quantify the concept of
reasonable doubt."); *see generally* Peter Tillers & Jonathan Gottfried, *Case
Comment—United States v. Copeland, 369 F. Supp.2d 275 (E.D.N.Y. 2005): A
Collateral Attack on the Legal Maxim that Proof beyond a Reasonable Doubt Is
Unquantifiable?*, 5 Law, Probability, and Risk 135, 135 (2006) (observing
"[a]ppellate courts have condemned such attempts at quantification of
reasonable doubt whenever they have encountered them" and collecting cases).

[25]  At the same time, attempts to quantify the reasonable doubt standard typically
will not result in reversal when the trial court otherwise properly instructs the
jury on reasonable doubt.  For example, in *Adcock v. State*:

During voir dire, the prosecutor analogized the case to a twenty-piece jigsaw puzzle that was missing two pieces to highlight the difference between "beyond a reasonable doubt and beyond all possible doubt." More specifically, the prosecutor asked one potential juror: "I put the jigsaw puzzle together and it's missing a few pieces, two (2) pieces . . . . [W]ithin my jigsaw puzzle you can still see what the picture is supposed to be, is that the same as beyond a reasonable doubt or is that beyond all possible doubt?" The prosecutor posed additional questions and explained that the purpose of the jigsaw puzzle analogy was that "if you have the whole puzzle that would be proof beyond all possible doubt because you could see the whole picture. I just wanted to make sure that you weren't going to hold me to that higher burden."

933 N.E.2d 21, 25 (Ind. Ct. App. 2010) (record citations omitted), *trans. denied*.

[26] On appeal, the defendant, Adcock, argued that the prosecutor's puzzle analogy constituted fundamental error. *Id*. at 26. A panel of this Court cautioned that the prosecutor's use of the analogy was "dangerous and unwise," *id*. at 28 n.6; however, the Court held that the prosecutor's statements did not constitute fundamental error because "Adcock was afforded the opportunity to rebut the prosecutor's analogy and the trial court provided the jury with a detailed instruction that contained the correct definition of reasonable doubt and the State's burden of proof." *Id*. at 28.

[27] *Adcock* concerned a statement made by a prosecutor. The issue of whether a trial court's own attempts to quantify the reasonable doubt standard violates the defendant's due process rights appears to be an issue of first impression for Indiana courts. Nonetheless, courts from other jurisdictions have generally

applied similar principles and have held that the trial court's attempts at quantification are not grounds for reversal when the trial court later properly instructs the jury on the reasonable doubt standard before the jury reaches a verdict. For example, in *Petrocelli v. Angelone*, 248 F.3d 877 (9th Cir. 2001), Petrocelli petitioned for a writ of habeas corpus on the grounds that the State trial court judge violated Petrocelli's due process rights during voir dire by stating to the jury:

> Now in a civil case . . . it's kind of a 50/50 proposition. But there is no 60/40, 70/30, 90/10 proposition in proving a case by a certain amount of evidence in a criminal case, because the burden, the standard is beyond a reasonable doubt . . . . **Some people say you have got to be convinced, and then others use, sports minded, use a kind of athletic football field, getting to the 97 yard line.** There are all kinds of ways to say it, but it is being strongly convinced of the Defendant's guilt, or else he is acquitted.

*Id*. at 888 (emphasis added).

[28] On appeal, the Court held that the trial court's statement did not violate Petrocelli's due process rights because "even if the judge improperly advised the jury by quantifying the level of doubt in petitioner's case, the judge, during voir dire and in his closing instructions to the jury, gave a proper reasonable doubt instruction." *Id*. The court noted that "'[b]ecause the trial judge used the correct instruction at the end of trial and because the correct instruction was the only instruction given to the jury to take with them to the jury room, it [should be] presumed that the jury followed the correct instruction." *Id*. at 888-89

(quoting *Guam v. Ignacio*, 852 F.2d 459, 461 (9th Cir. 1988)). As relevant here, the Court also noted that the trial court's "remark was **not made as an instruction**, but as an explanation during voir dire to see if the jurors could apply the burden." *Id*. at 889 (emphasis added); *cf. Commonwealth v. Rosa*, 661 N.E.2d 56, 64 (Mass. 1996) (trial court's supplemental instruction that analogized completing 940 pieces of a 1000-piece puzzle and being able to infer the puzzle's complete image with being able to use circumstantial evidence to infer a fact was not reversible error when "a reasonable juror would have separated the circumstantial evidence instruction from the entirely correct, and subsequently given, definition of reasonable doubt"). In essence, an isolated, improper description of the reasonable doubt standard might be curable by subsequent proper instructions.

[29] On the other hand, an improper instruction on the reasonable doubt standard is more likely to constitute reversible error when it is given close in time to jury deliberation and not cured by a subsequent instruction. *See, e.g.*, *Sullivan v. Louisiana*, 508 U.S. 275, 278-82 (1993) (trial court's erroneous final instruction on proof beyond a reasonable doubt required reversal); *Commonwealth v. Sullivan*, 482 N.E.2d 1198, 1199, 1201 (Mass. App. Ct. 1985) (holding that trial court's supplemental instruction defining the reasonable doubt standard as "above fifty percent" given during the third day of deliberation constituted reversible error and observing that the erroneous instruction "was among the last impressions left on the minds of the jurors").

[30] First, whether or not the trial court's remark constitutes a jury instruction, it was clearly improper. The reasonable doubt standard is not amenable to quantification. Whether the strength of the evidence is sufficient to convince a juror of the defendant's guilt beyond a reasonable doubt and whether the evidence is sufficient to convince a jury beyond a certain numerical threshold are two separate and distinct concepts, and the latter cannot be substituted for the former in a criminal trial. By endorsing eighty-percent certainty as a description of the reasonable doubt standard here, the trial court misinformed the jury on one of the most critical protections our Constitution provides for the criminally accused. We, thus, caution our trial courts to avoid attempting to quantify the reasonable doubt standard—period.

[31] The trial court's remark, however, does not automatically require reversal. Dean must persuade us that the remark constitutes fundamental error. Fundamental error "occurs only when the error 'makes a fair trial impossible or constitutes clearly blatant violations of basic and elementary principles of due process presenting an undeniable and substantial potential for harm.'" *Strack v. State*, 186 N.E.3d 99, 103 (Ind. 2022) (quoting *Clark v. State*, 915 N.E.2d 126, 131 (Ind. 2009)). It is an "extremely narrow doctrine." *Isom v. State*, 170 N.E.3d 623, 651 (Ind. 2021).

[32] Here, we cannot say that the error is fundamental. The trial court's remark was an isolated event during the voir dire stage of an eight-day jury trial. At all other points, the trial court properly instructed the jury on the reasonable doubt standard, including at the most critical juncture—immediately before

deliberation. The prospective juror who was being examined at the time the trial court made the remark was not selected to serve on the jury. The State also repeatedly impressed upon the jury that it needed to be firmly convinced of Dean's guilt. Finally, although the remark was erroneous because it attempted to quantify the reasonable doubt standard, nothing suggests that the jury failed to hold the State to its burden of proof. *See Winegeart*, 665 N.E.2d at 897 (requiring "a reasonable likelihood" that the jury misapplied the reasonable doubt standard). The trial court should not have attempted to quantify the reasonable doubt standard; however, in the context of the entire trial, we cannot say that the trial court's remark rises to the level of fundamental error.

## II. *Sufficiency of the Evidence*

[33] Dean next argues that the State presented insufficient evidence to support her conviction for felony murder. We are not persuaded. Sufficiency of evidence claims "warrant a deferential standard, in which we neither reweigh the evidence nor judge witness credibility." *Powell v. State*, 151 N.E.3d 256, 262 (Ind. 2020) (citing *Perry v. State*, 638 N.E.2d 1236, 1242 (Ind. 1994)). "When there are conflicts in the evidence, the jury must resolve them." *Young v. State*, 198 N.E.3d 1172, 1176 (Ind. 2022). We consider only the evidence supporting the judgment and any reasonable inferences drawn from that evidence. *Powell*, 151 N.E.3d at 262 (citing *Brantley v. State*, 91 N.E.3d 566, 570 (Ind. 2018), *cert. denied*). "We will affirm a conviction if there is substantial evidence of probative value that would lead a reasonable trier of fact to conclude that the defendant was guilty beyond a reasonable doubt." *Id.* at 263. We affirm the

conviction "unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." *Sutton v. State*, 167 N.E.3d 800, 801 (Ind. Ct. App. 2021) (quoting *Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007)).

### *A. Robbery*

[34] Dean first challenges the sufficiency of the evidence to support a finding that she was an accomplice to robbery.[3] Robbery is defined by Indiana Code Section 35-42-5-1(a), which provides, in pertinent part:

> [A] person who knowingly or intentionally takes property from another person or from the presence of another person:
>
> > (1) by using or threatening the use of force on any person; or
> >
> > (2) by putting any person in fear;
>
> commits robbery. . . .

[35] Dean need not have personally committed the robbery to be guilty of the same under the theory of accomplice liability. *Hall v. State*, 177 N.E.3d 1183, 1191 (Ind. 2021); *see* Ind. Code § 35-41-2-4 ("A person who knowingly or

---

[3] Though Dean was not charged with robbery, robbery may still serve as the predicate offense for her felony murder conviction. *See Snodgrass v. State*, 406 N.E.2d 641, 643 (Ind. 1980) (holding that underlying felony need not be separately charged because felony murder charge "necessarily charges . . . the underlying felony").

intentionally aids, induces, or causes another person to commit an offense commits that offense . . . .").  "'[A]n accomplice is criminally responsible for all acts committed by a confederate which are a probable and natural consequence of their concerted action.'"  *Forney v. State*, 742 N.E.2d 934, 938 (Ind. 2001) (quoting *McGee v. State*, 699 N.E.2d 264, 265 (Ind. 1998)).  In determining whether a person was an accomplice to robbery, we consider several factors, most significantly here, the defendant's "course of conduct before, during, and after the offense."  *Parrish v. State*, 166 N.E.3d 953, 959 (Ind. Ct. App. 2021) (citing *Griffin v. State*, 16 N.E.3d 997, 1004 (Ind. Ct. App. 2014)), *trans. denied*.

[36]     Here, the State presented evidence that Dean helped plan the robbery, identified a location in which to commit the robbery, provided the bat and bandana, helped cover up the evidence, lied to police, and encouraged Shianne to lie as well.  We find this evidence sufficient to support a finding that Dean was an accomplice to the robbery.  Dean's argument that "the only plan was for Shianne [] to exchange sex for money," Appellant's Br. p. 30, merely requests that we reweigh the evidence, which we cannot do.[4]

---

[4] Dean also argues that Tyrone's and Shianne's testimony was incredible regarding who was responsible for the robbery and killing and, as a result, the incredible dubiosity rule applies.  "Under the incredible dubiosity rule, a court will impinge upon the jury's responsibility to judge the credibility of witnesses only when confronted with inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity."  *Murray v. State*, 761 N.E.2d 406, 408 (Ind. 2002).  Application of the incredible dubiosity rule requires that there be: "1) a sole testifying witness; 2) testimony that is inherently contradictory, equivocal, or the result of coercion; and 3) a complete absence of circumstantial evidence."  *Moore v. State*, 27 N.E.3d 749, 756 (Ind. 2015).  Here, Dean's conviction was based on the testimony of multiple witnesses and several items of circumstantial evidence.  The incredible dubiosity rule, thus, does not apply.

## B. Felony murder

[37]   Dean next argues that the evidence is insufficient to trigger the felony murder doctrine. Indiana Code Section 35-42-1-1(2) provides that a person who:

> kills another human being while committing or attempting to commit arson, burglary, child molesting, consumer product tampering, criminal deviate conduct (under IC 35-42-4-2 before its repeal), kidnapping, rape, **robbery**, human trafficking, promotion of human labor trafficking, promotion of human sexual trafficking, promotion of child sexual trafficking, promotion of sexual trafficking of a younger child, child sexual trafficking, or carjacking (before its repeal);
>
> * * * * *
>
> commits murder, a felony.

(Emphasis added). "A felony murder conviction requires proof of intent to commit the underlying felony but not of intent to kill." *Glenn v. State*, 884 N.E.2d 347, 355 (Ind. Ct. App. 2008) (citing *Luna v. State,* 758 N.E.2d 515, 517 (Ind. 2001)), *trans. denied*. "Furthermore, a person is subject to conviction for felony murder based on accomplice liability for the underlying offense," *id.* (citing *Luna*, 758 N.E.2d at 517), and the convicted person need not be the killer,[5] *Layman v. State*, 42 N.E.3d 972, 977 (Ind. 2015). Rather, what matters is whether the accused "reasonably should have foreseen that his felonious

---

[5] Our Supreme Court has held that "the statutory language 'kills another human being while committing' does not restrict the felony murder provision only to instances in which the felon is the killer, but may also apply equally when, in committing any of the designated felonies, the felon contributes to the death of any person." *Jenkins v. State*, 726 N.E.2d 268, 269 (Ind. 2000).

conduct would result in the 'mediate or immediate cause' of the victim's death." *Id*. (quoting *Palmer v. State*, 704 N.E.2d 124, 126 (Ind. 1999)).

[38] Here, as we have explained, the State presented sufficient evidence that Dean was an accomplice to robbery, which is a predicate offense to felony murder. The State also presented evidence that the plan was to lure Willie with the prospect of sex with Shianne and then rob Willie. Dean provided Tyrone with a bandana and either Shianne or Tyrone with the bat.

[39] Dean relies on *Layman*, 42 N.E.3d 972, which we find distinguishable. In that case, the defendants, Laymen and Sparks, and several others conspired to burglarize a house that they believed was unoccupied. *Id*. at 974. Unbeknownst to the conspirators, the owner of the house was asleep, and when the burglars kicked in the back door, the owner awoke and began shooting a firearm. *Id*. Two of the conspirators were shot, and one was killed. *Id*. The State charged Layman and Sparks (and the others) with felony murder, and the jury found them guilty. *Id*.

[40] On appeal, our Supreme Court reversed Layman's and Sparks's convictions for felony murder. The Court held that "when the group broke and entered the residence of the homeowner intending to commit a theft—a burglary—not only were they unarmed, but also neither the Appellants nor their cohorts engaged in any 'dangerously violent and threatening conduct.'" *Id*. at 979 (quoting *Jenkins v. State*, 726 N.E.2d 268, 271 (Ind. 2000)). Accordingly, the Court agreed with the defendants that the death of their co-conspirator "was not reasonably

foreseeable" and found "[t]here was simply nothing about the Appellants' conduct or the conduct of their cohorts that was 'clearly the mediate or immediate cause' of their friend's death." *Id*. at 979-80 (quoting *Palmer*, 704 at 126).

[41] Dean argues, with little explanation, that, as in *Layman*, the robbery here was not foreseeable. Unlike *Layman*, however, where the defendants were unarmed, Dean provided Tyrone and Shianne with the bat and bandana. It was reasonably foreseeable that the bat could be used in a violent manner, and in fact, it was. Accordingly, the felony murder doctrine is applicable, and the State presented sufficient evidence to support Dean's conviction.

### III. Inappropriate Sentence

[42] Dean's final argument is that her sentence of sixty years is inappropriate. Again, we are not persuaded. The Indiana Constitution authorizes independent appellate review and revision of a trial court's sentencing decision. *See* Ind. Const. art. 7, §§ 4, 6; *Jackson v. State*, 145 N.E.3d 783, 784 (Ind. 2020). Our Supreme Court has implemented this authority through Indiana Appellate Rule 7(B), which allows this Court to revise a sentence when it is "inappropriate in light of the nature of the offense and the character of the offender."[6] Our review of a sentence under Appellate Rule 7(B) is not an act of

---

[6] Though we must consider both the nature of the offense and the character of the offender, an appellant need not prove that each prong independently renders a sentence inappropriate. *See, e.g.*, *State v. Stidham*, 157 N.E.3d 1185, 1195 (Ind. 2020) (granting a sentence reduction based solely on an analysis of aspects of the

second guessing the trial court's sentence; rather, "[o]ur posture on appeal is [ ] deferential" to the trial court. *Bowman v. State*, 51 N.E.3d 1174, 1181 (Ind. 2016) (citing *Rice v. State*, 6 N.E.3d 940, 946 (Ind. 2014)). We exercise our authority under Appellate Rule 7(B) only in "exceptional cases, and its exercise 'boils down to our collective sense of what is appropriate.'" *Mullins v. State*, 148 N.E.3d 986, 987 (Ind. 2020) (per curiam) (quoting *Faith v. State*, 131 N.E.3d 158, 160 (Ind. 2019)).

[43]     "'The principal role of appellate review is to attempt to leaven the outliers.'" *McCain v. State*, 148 N.E.3d 977, 985 (Ind. 2020) (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008)). The point is "not to achieve a perceived correct sentence." *Id*. "Whether a sentence should be deemed inappropriate 'turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case.'" *Id*. (quoting *Cardwell*, 895 N.E.2d at 1224). Deference to the trial court's sentence "should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). When determining whether a sentence is inappropriate, the advisory sentence is the starting point the legislature has

---

defendant's character); *Connor v. State*, 58 N.E.3d 215, 219 (Ind. Ct. App. 2016); *see also Davis v. State*, 173 N.E.3d 700, 707-09 (Ind. Ct. App. 2021) (Tavitas, J., concurring in result).

selected as an appropriate sentence for the crime committed. *Fuller v. State*, 9 N.E.3d 653, 657 (Ind. 2014).

[44] In the case at bar, Dean was convicted of felony murder. Indiana Code Section 35-50-2-3 sets the sentencing range for murder between forty-five and sixty-five years, with the advisory sentence set at fifty-five years. Dean was sentenced to sixty years in the DOC.

## A. Nature of the Offense

[45] Our analysis of the "nature of the offense" requires us to look at the nature, extent, heinousness, and brutality of the offense. *See Brown v. State*, 10 N.E.3d 1, 5 (Ind. 2014). Dean contends that her sentence is inappropriate because she neither intended nor foresaw the death of the victim. Dean, however, helped plan the robbery, provided the bat and bandana, helped cover up the evidence, lied to police, and encouraged Shianne to lie as well. Additionally, Shianne testified that Dean has a history of manipulating Shianne into committing prostitution and robbery, and this offense appears to be a continuation of that exploitative conduct. We cannot say that Dean's sentence is inappropriate in light of the nature of the offense.

## B. Character of the Offender

[46] Our analysis of the character of the offender involves a broad consideration of a defendant's qualities, including the defendant's age, criminal history, background, past rehabilitative efforts, and remorse. *See Harris v. State*, 165 N.E.3d 91, 100 (Ind. 2021); *McCain*, 148 N.E.3d at 985. The significance of a

criminal history in assessing a defendant's character and an appropriate sentence varies based on the gravity, nature, proximity, and number of prior offenses in relation to the current offense. *Pierce*, 949 N.E.2d at 352-53; *see also Sandleben v. State*, 29 N.E.3d 126, 137 (Ind. Ct. App. 2015) (citing *Bryant v. State*, 841 N.E.2d 1154, 1156 (Ind. 2006)), *trans. denied*. "Even a minor criminal history is a poor reflection of a defendant's character." *Prince v. State*, 148 N.E.3d 1171, 1174 (Ind. Ct. App. 2020) (citing *Moss v. State*, 13 N.E.3d 440, 448 (Ind. Ct. App. 2014), *trans. denied*).

[47] Here, Dean's criminal history consists of over one dozen misdemeanor convictions for check deception; misdemeanor convictions for conversion and driving-related offenses; several felony convictions for theft, forgery, and counterfeiting; and several probation revocations. Moreover, Dean fails to direct us to any positive character traits on her part. Accordingly, we cannot say that Dean's sentence is inappropriate in light of her character.

### C. Tyrone's sentence

[48] Lastly, Dean argues that her sixty-year sentence is inappropriate because Tyrone was sentenced to only forty-five years.[7] "Although we need not compare the sentences of codefendants we are not precluded from comparing sentences among those convicted of the same or similar crimes." *Marley v. State*, 17 N.E.3d 335, 339 (Ind. Ct. App. 2014) (citing *Knight v. State*, 930

---

[7] At the time of this appeal, Shianne's trial had not yet occurred.

N.E.2d 20, 22 (Ind. 2010)), *trans. denied*. When pressing the claim that one's sentence is inappropriate based on the sentence of another, "[i]t is the defendant's burden on appeal to persuade us that the sentence imposed by the trial court is inappropriate." *Id*. (citing *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind. 2006)).

[49] Here, we are not persuaded that Dean's sentence is inappropriate in light of Tyrone's sentence. Unlike Dean, Tyrone pleaded guilty to murder, which the trial court found to be a mitigating factor in Tyrone's sentence. Indeed, our courts have long recognized that due to "crowded court dockets and a limited number of judges to hear those growing dockets, defendants who plead guilty save valuable judicial time and resources." *Trueblood v. State*, 715 N.E.2d 1242, 1257 (Ind. 1999). Guilty pleas also spare victims the emotional toll of a lengthy trial and often demonstrate "the defendant's acceptance of responsibility for a crime." *Id*. Additionally, Tyrone's criminal history, which consisted of only a traffic violation, was significantly less extensive than Dean's.

[50] It is true that Tyrone might have "struck the fatal blows" that killed Willie. Appellant's Br. p. 37. That, however, does not diminish Dean's role in the conspiracy, which included planning the robbery, providing the murder weapon, and covering up the evidence. Not all co-conspirators are entitled to the same sentence, and in fact, we trust our trial courts to carefully consider the unique set of aggravating and mitigating factors in each case. This will inevitably result in different sentences. Our task is to determine whether Dean's

sentence is inappropriate. Given the facts and circumstances here, we cannot say that is the case.

## Conclusion

[51] The trial court's remark endorsing eighty-percent certainty as a description of the reasonable doubt standard was improper but does not rise to the level of fundamental error. Additionally, sufficient evidence supports Dean's conviction, and her sentence is not inappropriate. Accordingly, we affirm.

[52] Affirmed.

May, J., and Bradford, J., concur.